# THE JOHN H. PEARSON.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE
DISTRICT OF MASSACHUSETTS.

Argued April 11, 12, 1887. — Decided April 25, 1887.

A vessel was chartered to carry a cargo of oranges from Palermo to Bos-
ton. The words "captain engages himself to take the northern pas-
sage" were written into the printed blank. The cargo was badly
damaged, and the charterers libelled the vessel to recover for the loss.
The court below found that "northern passage" appeared from the
proof to be a term of art, anintelligible without the aid of testimony,
that the evidence concerning it was conflicting, and that it was imma-te-
rial to decide it, as the claimant was entitled to the least strict defini-
tion, and the actual course of the vessel came within that definition.
*Held*, that this was error; that if the term was a term of art, it should
have been found by the court; and that if there was no passage known
as "northern," the vessel was bound to take the one which would
carry it in a northerly direction through the coolest waters into the
coolest temperature, and the court should have ascertained from the
proof what passages between Gibraltar and Boston vessels were accus-
tomed to take, and should have determined which of them the contract
permitted the vessel to choose.

THIS was an appeal in admiralty, and presented the follow-
ing facts:

The barque John H. Pearson was chartered to carry a
cargo, consisting mostly of oranges, for the libellants, from
Palermo, Sicily, to Boston, Massachusetts. The charter party
contained the words "captain engages himself to take the
northern passage," inserted at the instance of the libellants,
for the benefit of the cargo, and written into the printed
blank. The cargo was badly damaged on the voyage, and
this suit was brought to recover for the loss. The controversy
is as to whether the vessel, in going from Gibraltar to Boston,
took the "northern passage."

The court found that "shippers of fruit consider it of very
great importance for the preservation of the cargo that it be
kept in as cold a temperature as possible, short of the freezing

point, and have been accustomed for many years to instruct masters to take a northerly course;" and, after setting forth other facts, stated as "conclusions of law" the following:

"1. The term 'northern passage' appears, in view of the testimony of merchants and seamen introduced on both sides, to be a term of art, and is, when taken by itself, without the aid of such testimony, unintelligible.

"The testimony introduced by the libellants tended to show that the phrase meant a passage from Gibraltar to the Great Banks, and thence direct to Boston, keeping as much to the north as possible during the entire passage; that anything be-. tween that and the southern passage was the middle passage.

"That introduced by the claimant tended to show that it meant anything north of latitudes 30° to 35° or 36°, or of the southern passage; and that the middle passage was anything between the southern passage and the northern, as described by the respective witnesses.

"It was admitted that the southern passage was in the trade winds.

"2. Upon this testimony, the court, thinking that the true meaning of the term is very doubtful, does not consider it material, and does not undertake to decide whether a preponderance of the evidence favors one of the above definitions or another, and rules that the claimant is entitled to the least strict definition, and that, as the course of the barque comes within such definition, there is no deviation."

The libel was dismissed, and from a decree to that effect this appeal was taken. The opinion of the Circuit Court is reported in 14 Fed. Rep. 749.

*Mr. Henry W. Putnam* for appellants.

*Mr. Frederic Dodge* for appellees.

The facts found do not of themselves establish any construction of the phrase "northern passage," still less the construction claimed by appellant. There is nothing in the facts found which casts upon the appellee any burden of proof, or warrants any presumption which must be rebutted by him.

Upon a resort to evidence for the meaning of the phrase in question, the stricter construction contended for by the appellant is not established by a mere preponderance of evidence in favor of his construction; — still less in the case of an equal balance of opposing evidence as to the meaning. The appellants have to show, in order to establish their interpretation, not merely that there *is a usage* such as they claim as to the meaning, but that there is a usage *so general, so well known* and so *universally accepted*, that the parties to this contract *must be presumed* to have used the words in the sense so established. *The Paragon*, 1 Ware, 322; *Rogers* v. *Mechanics' Ins. Co.*, 1 Story, 603; *Robinson* v. *The United States*, 13 Wall. 363; see also *Barnard* v. *Kellogg*, 10 Wall. 383; *Kirchner* v. *Venus*, 12 Moore, P. C. 361; *Winsor* v. *Dillaway*, 4 Met. (Mass.) 221; *Porter* v. *Hills*, 114 Mass. 106; *Mooney* v. *Howard Ins. Co.*, 138 Mass. 375; *Harris* v. *Tunbridge*, 83 N. Y. 92, 100; *Lyon* v. *Culbertson*, 83 Ill. 33, 37.

Such a usage as is thus shown to be necessary for the appellants' purposes, is not necessarily established by the fact that a preponderance of the evidence favors the meaning they contend for. *Parrott* v. *Thacher*, 9 Pick. 426; *Porter* v. *Hills*, above cited; *Winsor* v. *Dillaway*, 4 Met. (Mass.) 221; *Brown* v. *Brown*, 8 Met. 573, 276; *Daniels* v. *Insurance Co.*, 12 Cush. 416, 429; [1] *Law* v. *Cross*, 1 Black, 533.

The conclusion of the circuit judge, therefore, that "the true meaning of the term is very doubtful" really amounts to a finding of *fact*, that no such usage existed as was necessary to establish the meaning or definition asserted by the appellants.

If the maxim that the words are to be construed "*fortius contra proferentem*" has any application to the case, it is important first to determine who is "*proferens*."

It is said in a recent text-book, " It is often difficult to decide who are the *proferentes* with regard to special words of a contract, but this is to be determined in each case upon an examination of the substance and character of words, made in the light of the whole contract and the circumstances sur-

---

[1] *S. C.* 59 Am. Dec. 192.

rounding it." Jones on Construction of Commercial and Trade Contracts, New York, 1886, § 230. An examination of the cases shows, however, that whenever the words appear to have been selected by one of the parties for his own benefit, and by him proposed for the other's acceptance, — although they may be in form a promise by the other, — yet he who selects them is *proferens*, within the meaning of the maxim, and the construction is to be most strict against him, and most favorable against the other. This principle has been often applied to policies of insurance: *National Bank* v. *Ins. Co.*, 95 U. S. 673, 679; *Grace* v. *Am. Central Ins. Co.*, 109 U. S. 278, 282; *Moulor* v. *Am. Life Ins. Co.*, 111 U. S. 335, 341. And in like manner to Charter Parties; *Hudson* v. *Ede*, L. R. 2 Q. B. 566, 578; *Burton* v. *English*, 12 Q. B. D. 218, 220, 222; *Airey* v. *Merrill*, 2 Curtis, 8, 11; *Issakson* v. *Williams*, 26 Fed. Rep. 642, 644. See also Sandar's Justinian, 6th ed., 332; Bouvier, Law Dictionary, *Stipulatio ;* Maine, Ancient Law, London, 1870, 328, 329; Code Civil (France), Liv. III. tit. iii. § v. de l'Interprétation des Conventions, art. 1162; Revue International de Droit Maritime, 1885-6, 44.

Mr. Chief Justice Waite, after stating the case, delivered the opinion of the court.

As the libellants deemed the agreement to "take the northern passage" of sufficient importance to have a printed form changed, so that it might be incorporated in express words into the charter party, and this "for the benefit of the cargo," which was perishable, it is evident that the words used had some meaning which indicated clearly to the minds of the contracting parties the direction the vessel was to take on her way from Gibraltar to Boston. It is also evident, from the fact that the vessel was bound to take *the* northern passage, that the parties understood there was more than one passage which vessels were in the habit of taking in making that voyage, according as their bills of lading or their charter parties required, or the circumstances made desirable. It implies that there were one or more other passages which those engaged in the trade knew by other names or other

descriptions. What "the northern passage" as used in this contract means, therefore, is either a question of fact or a question of construction applicable to understood facts.

If it is, as the court below says it appears to be, a term of art, which, taken by itself, without the aid of the testimony, is unintelligible, then its meaning in "the art" — the trade — is one of the material facts in the case on which the rights of the parties depend, and it should have been found and put into the findings of fact which the Circuit Court was required by law to make. The statement of the court, now in the record, implies that there is in fact some particular passage between Gibraltar and Boston, which those engaged in that trade know as "the northern passage." If there is, then that is the passage the vessel was bound to take, and it was error in the court to decide that its determination, according to the preponderance of the evidence, was immaterial, for the choice of passages was matter of obligation, not of convenience merely.

If in point of fact there is no passage to which the name or description of "the northern" has been given in the trade, then the question becomes one of construction as applied to the known facts of the business. The inquiry is, not as to which passage would be the quickest, or even the best, or which another contract would require of another vessel, but which is "the northern passage" within the meaning of this contract. The evident purpose of the libellants was, to keep the vessel as far as possible in the coolest of the passages that those engaged in the trade were accustomed to take, because it is found as a fact in the case that a cool temperature is necessary to the preservation of the cargo, and that the coolest water is north of the Gulf Stream, owing to the fact that there is a cold current between it and the American coast moving in an opposite direction.

Under these circumstances, if the testimony failed to show that any particular passage had acquired in the trade the name of "the northern," it was error to rule that the vessel might voluntarily take any other of the known or accustomed passages than one which would carry it in a northerly di-

rection through the coolest waters and into the coolest temperature. That this was the expectation of the parties is shown by the fact that the stipulation as to the passage was made "for the benefit of the cargo," the preservation of which required that it should be kept "in as cold a temperature as possible, short of the freezing point." The court should have ascertained from the evidence what passages there were between Gibraltar and Boston which vessels were accustomed to take, and then determined which of them this vessel was allowed by its contract to choose as "the northern."

> *The decree is reversed, and the cause remanded for further proceedings in conformity with this opinion.*