## THE JOHN H. PEARSON.

FILIBERTO *et al. v.* TAYLOR.

*(Circuit Court, D. Massachusetts.* January 18, 1888.)

1. SHIPPING—CHARTER-PARTY—NORTHERN PASSAGE.
 The term "northern passage," as used in the Mediterranean fruit trade, and incorporated in a charter-party to ship fruit from Sicily to Boston, *held* to have a distinct meaning, and that its course is from Gibraltar north of the Azores, if possible; if not, just south of the islands; thence to the southern point or tail of the Great Banks; and then direct to port.

2. SAME.
 In an action for damages for loss of a cargo, where the charter-party provided that the vessel should take the "northern passage," *held* that, in the absence of any known passage to which that description had been given, the ship was bound to keep the coolest passage those in the trade were accustomed to keep.

In Admiralty.

The bark John H. Pearson was chartered to carry a cargo consisting mostly of oranges for the libelants, Filiberto and others, from Palermo, Sicily, to Boston, Massachusetts. The charter-party contained the words, "captain engages himself to take the northern passage," inserted at the

instance of libelants, for the benefit of the cargo, and written into the printed blank. The cargo was badly damaged on the voyage, and this action brought to recover for the loss. The case was once tried in this court, and an appeal taken to the supreme court, (7 Sup. Ct. Rep. 1008,) and, under the decision there, comes back to the circuit court for further proceedings in conformity therewith.

*H. W. Putnam*, for libelant.

*John C. Dodge & Sons*, for claimant.

CoLT, J. Under the decision of the supreme court, (121 U. S. 469, 7 Sup. Ct. Rep. 1008,) this case comes back to the circuit court for further proceedings, in conformity with the opinion. The court, in its opinion, says:

"What 'the northern passage,' as used in this contract, means, therefore, is either a question of fact, or a question of construction applicable to understood facts. If it is, as the court below says it appears to be, a term of art, which, taken by itself, without the aid of the testimony, is unintelligible, then its meaning in 'the art'—the trade—is one of the material facts in the case on which the rights of the parties depend, and it should have been found and put into the findings of fact which the circuit court was required by law to make. * * * If, in point of fact, there is no passage to which the name or description of 'the northern' has been given in the trade, then the question becomes one of construction, as applied to the known facts of the business. The inquiry is not as to which passage would be the quickest, or even the best, or which another contract would require of another vessel, but which is 'the northern passage,' within the meaning of this contract. The evident purpose of the libelants was to keep the vessel as far as possible in the coolest of the passages that those engaged in the trade were accustomed to take; because it is found as a fact in the case that a cool temperature is necessary to the preservation of the cargo, and that the coolest water is north of the Gulf Stream, owing to the fact that there is a cold current between it and the American coast, moving in an opposite direction."

As to what constitutes a "northern passage" from Gibraltar to Boston, within the meaning of the charter-party, the libelants in the district court called 10 witnesses, and the claimant 13. In the circuit court the libelants called seven more witnesses, and the claimant none. From a careful examination of the record, I cannot but conclude that the libelants have shown by a preponderance of evidence that in the Mediterranean fruit trade the term "northern passage" had a distinct meaning, and that it was a course from Gibraltar north of the Azores, if possible; if not, just south of the islands; thence to the southern point or tail of the Great Banks, and then direct to Boston. The testimony of the libelants seems to me to be, on the whole, more definite in character, and more disinterested, and therefore of greater weight, independently of the question of the number of witnesses. But, even if it should be considered that there is no passage in the trade to which the name of "the northern" could be given, I am satisfied upon the evidence that the vessel did not take the course which it was understood by the contract she should have taken. The supreme court declares that if there is no passage to which the description of "the northern" has been given in the trade, then the

question becomes one of construction, as applied to the known facts in the business; in other words, the vessel should have been kept in the coolest of passages that those engaged in the trade were accustomed to keep. It seems to me clear that the cool passages those engaged in the trade usually took were to the north, or just south, of the Azores, and from thence to the southern point of the Great Banks; and that the John II. Pearson, by not taking this course, violated an express provision in the charter-party. In either view of the construction put upon these words, "the northern passage," by the supreme court, I am of opinion that the libelants have made out their case upon the evidence, and that a decree should be entered in their favor.