## THE E. A. PACKER, SCULLY Claimant.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE
SOUTHERN DISTRICT OF NEW YORK.

No. 286. Argued April 3, 6, 1891. — Decided May 11, 1891.

The general rule, which prevails in cases tried by a Circuit Court without a jury, that the trial court is bound to find every fact material to its conclusion of law, and that a refusal to do so, if properly excepted to, is ground for reversal, prevails also in admiralty causes.

The libel in this case set forth, as ground for recovery, a collision between the barge Cross Creek in tow by the tug Packer, and the barge Atlanta, in tow by the tug Wolverton, whereby the latter barge and its cargo suffered material injury. The main question at issue was as to which tug was in fault. After the Circuit Court had made its findings of fact, the claimant submitted requests for several additional findings, which the judge declined to find otherwise than as he had already found. Among these was the following: "The porting of the Wolverton's wheel, when she was about 200 feet from the Packer, was a change of four or five points from her course." It appeared from the evidence brought up with the exceptions that such was the fact. Held, that the claimant was entitled to a finding in regard to this point.

THIS was a suit in admiralty instituted by the New Jersey Lighterage Company, appellee, owner of the barge Atlanta, against the steam tug Dr. John Wolverton, which had the Atlanta in tow, and also against the steam tug E. A. Packer, to recover damages for a collision between the Atlanta and a barge lashed alongside and in tow of the Packer, on her port side, known as Cross Creek Barge, No. 5, which occurred in the afternoon of October 25, 1880, near the mouth of the East River in the harbor of New York. Service never having been obtained upon the Wolverton, the case proceeded against the Packer, and in the District Court a decree was granted dismissing the libel upon the ground that the Wolverton was solely at fault for the collision. 20 Fed. Rep. 327. Upon appeal to the Circuit Court, this decree was reversed upon the ground that the collision was partly at least the fault of the Packer, and that, under the rulings of this court, the libellant

was entitled to recover its entire damages against her, which amounted, with interest, to $5404.31, for which a decree was rendered against her.

Pursuant to the act of February 16, 1875, 18 Stat. 315, c. 77, the following facts were found by the Circuit Court:

" First. That on the 25th day of October, 1880, the libellant was the owner of the barge Atlanta and was a common carrier of a cargo on said barge, as alleged in the libel.

" Second. That on that day, in the afternoon, a collision occurred between said barge and the barge Cross Creek, No. 5, then in tow of the steam tug Packer.

" Third. That the barge Atlanta and her cargo were on that day taken in tow by the steam tug Wolverton at Roberts' Stores in the East River, to be towed to the Long Dock, Jersey City, and were towed astern of said tug by a hawser of one hundred and fifty feet in length between the tug and barge.

" Fourth. That on that day the tug Packer was bound from the North River into the East River, having in tow on her port side the barge Cross Creek, No. 5, loaded with about 450 tons of coal, the barge projecting beyond the bow of the tug.

" Fifth. As the Wolverton, with her tow, was crossing the mouth of the East River the Packer, with her tow, was heading around the Battery into the East River, passing the New York shore opposite the Barge Office, nearly two hundred yards away.

" Sixth. That the tide in the East River was ebb and at about full strength. The Wolverton and her tow were going with the tide about seven miles an hour and the Packer and her tow were proceeding against the tide at a speed of about two miles an hour.

" Seventh. That the Packer and her tow had come so far around from the North River before seeing the Wolverton as to be in the ebb tide coming out of the East River, and when she saw her was heading up against that tide and was about 200 yards out from the shore opposite the Barge Office.

" Eighth. The vessels saw each other when about 500 yards apart, and at that time the course of the Wolverton was about N. W. by N. and the course of the Packer was E. by N., and

as they approached each other the Packer had the Wolverton on her starboard bow and the Wolverton had the Packer on her port bow, the Wolverton being further out in the river from the New York shore than the Packer, and the vessels being upon crossing courses converging toward the New York shore.

"Ninth. As soon as the Packer saw the Wolverton she blew two blasts of her steam whistle. She was then under a starboard wheel and making in somewhat towards the end of the piers, but upon signalling the Wolverton she starboarded her wheel still more. The Wolverton made no reply to the Packer's signals, but kept on her course without abating speed until within about 200 feet. The Packer then blew two more whistles and reversed her engines, and the Wolverton ported her wheel. The Wolverton passed the bow of the Packer and her tow, but the libellant's barge was unable to do so, and her port side came into collision with the bow of the Packer's tow.

"Tenth. At the time the Wolverton ported her wheel danger of collision was imminent and a collision seemed unavoidable.

"Eleventh. There was nothing in the river to interfere with the navigation of either vessel. The collision occurred about 400 or 500 feet off the ends of the piers and just below the slip of the South Ferry.

"Twelfth. There was no local usage of navigation applicable to the situation of the vessels when they discovered each other.

"Thirteenth. That between the tide of the East River and the North River there is an eddy which extends out about 400 feet from the Barge Office, and the Packer had passed through this eddy and reached the ebb tide, which struck on the port bow of her tow and swung the vessels still further off shore before her pilot saw the Wolverton.

"Fourteenth. The libellant's barge was in all respects properly navigated. By reason of the collision the barge and cargo sustained serious injury."

The following conclusions of law are found:

"First. The two tugs being on crossing courses, it was the

duty of the Packer, having the Wolverton on her starboard hand, to keep out of the way, and the duty of the Wolverton to keep her course.

"Second. It was the duty of the Packer to port her wheel and stop and reverse her engine in time to avoid the collision.

"Third. The libellant is entitled to recover against the Packer the damages sustained by the collision."

The course of the Wolverton, as stated in the eighth finding, was subsequently changed by the Circuit Judge from N.W. by N. to W.N.W.

From the decree entered upon this finding an appeal was taken by the owner of the Packer to this court.

*Mr. Edward D. McCarthy* (with whom was *Mr. de L. Berier* on the brief), for appellant.

*Mr. Robert D. Benedict* for appellee.

Mr. Justice Brown delivered the opinion of the court.

This court has repeatedly held that under the act of February 16, 1875, 18 Stat. 315, "to facilitate the disposition of cases in the Supreme Court of the United States, and for other purposes," we are no longer at liberty to pass upon disputed questions of fact, but are bound to accept the findings of the Circuit Court as conclusive, and are limited to a determination of questions of law and to the validity of such rulings, excepted to at the time, as may be presented by a bill of exceptions prepared as in actions at law. *The Abbotsford,* 98 U. S. 440; *The Benefactor,* 102 U. S. 214; *The Clara,* 102 U. S. 200; *The Adriatic,* 103 U. S. 730; *The Connemara,* 108 U. S. 352, 360; *Watts* v. *Camors,* 115 U. S. 353, 363; *The Gazelle and Cargo,* 128 U. S. 474. In the case of *The Abbotsford* it was held that the only rulings which could be presented for review here by bill of exceptions were those made upon questions of law, following in this particular a multitude of prior rulings under analogous statutes. This was also affirmed in *The Annie Lindsley,* 104 U. S. 185, with an additional remark

by Mr. Justice Woods, that "where the Circuit Court has *passed on all the issues* we cannot listen to complaints that it has refused to find certain facts which it was asked to find, or has found certain other facts which the weight of the testimony did not warrant."

It does not, however, necessarily follow that this court is bound to determine the case upon the precise facts found by the Circuit Court, if, in its opinion, such findings are ambiguous, contradictory or incomplete, or fail to establish a satisfactory basis for a decision. The Circuit Court is bound to pass upon and find every material and ultimate fact necessary to a proper determination of the question of liability, and, in case of refusal to make such finding, an exception may be taken thereto, which can be considered by this court upon appeal. It cannot be that this court is concluded by a finding, for instance, of a single material fact tending to show fault on the part of one vessel, when there is uncontradicted evidence of other facts, which show either that this fault did not contribute to the collision, or that there were contributing faults upon the part of the other vessel which might make a case for a division of damages. If a Circuit Court could find *as a fact* that a collision was due to the fault of one vessel, an appeal to this court would be useless, and unless the findings set forth all the material facts, the ultimate finding of fault becomes more or less a finding of a fact, when it should be a legal inference from other facts.

The question is by no means a new one in this court. In *The Francis Wright*, 105 U. S. 381, 387, it was said by Chief Justice Waite that "if the Circuit Court neglects, or refuses, on request, to make a finding one way or the other on a question of fact, material to the determination of the cause, when evidence has been adduced on the subject, an exception to such refusal taken in time and properly presented by a bill of exceptions may be considered here on appeal. So, too, if the court, against remonstrance, finds a material fact which is not supported by any evidence whatever, and exception is taken, a bill of exceptions may be used to bring up for review the ruling in that particular. In the one case the refusal to find

would be equivalent to a ruling that the fact was immaterial; and in the other, that there was some evidence to prove what is found when in truth there was none. Both these are questions of law, and proper subjects for review in an appellate court." It was indicated that the bill of exceptions "must be prepared as in actions at law" where it is used, "not to draw the whole matter into examination again," but only separate and distinct points, and those of law. This practice was approved in *Merchants' Ins. Co.* v. *Allen*, 121 U. S. 67. In *The John H. Pearson*, 121 U. S. 469, the question arose as to what was meant by the term "Northern Passage" from Gibraltar to New York, and it was held that the court below should have ascertained from the evidence what passages there were which vessels were accustomed to take, and then determine which of them the vessel was allowed by its contract to choose as the northern, and the decree was reversed and the case remanded for further proceedings upon this ground.

There is no practice under this statute which is peculiar to courts of admiralty. The rule is general, that wherever the trial court finds the facts and the conclusions of law therefrom it is bound to find every fact material to its conclusion, and a refusal to do so, if properly excepted to, is a ground for reversal. Thus, in cases tried by the court without a jury, under Rev. Stat. sections 649 and 700, the findings of the Circuit Court are conclusive upon this court, and the power of this court to review extends only to the sufficiency of the facts found to support the judgment, *Tyng* v. *Grinnell*, 92 U. S. 467; and if not sufficient, the case may be remanded for trial upon other issues involved therein. *Ex parte French*, 91 U. S. 423. The findings of the court under these sections are treated as a special verdict, and are gauged by the rules applicable to them, *Norris* v. *Jackson*, 9 Wall. 125; *Copelin* v. *Insurance Co.*, 9 Wall. 461, 467; *Supervisors* v. *Kennicott*, 103 U. S. 554; and, as was said in *Graham* v. *Bayne*, 18 How. 60, 63, "if a special verdict be ambiguous or imperfect — if it find but the evidence of facts, and not the facts themselves, or finds but part of the facts in issue, and is silent as to others, it is a mistrial,

and the court of error must order a *venire de novo*.　They can render no judgment on an imperfect verdict, or case stated."

Under a similar method of procedure in several of the States it is held that the findings must contain all the facts and circumstances necessary to a proper determination of the questions involved; and in default thereof, the judgment of the court below will be reversed, and the case sent back for a new trial.　*Wood* v. *La Rue*, 9 Michigan, 158; *Howerter* v. *Kelly*, 23 Michigan, 337; *Adams* v. *Champion*, 31 Michigan, 233; *Briggs* v. *Brushaber*, 43 Michigan, 330; *Bates* v. *Wilbur*, 10 Wisconsin, 415; *Addleman* v. *Erwin*, 6 Indiana, 494.

The facts found in the present case are substantially, that the Wolverton and her tow were bound from Roberts' Stores, in the East River, upon the Brooklyn side, to the Long Dock, in Jersey City, upon a W.N.W. course, and at a speed of about seven miles an hour.　The Packer, with her barge alongside, constituting in fact one vessel, was heading around the Battery into the East River, and at the time she first saw the Wolverton was upon a course E. by N., and heading against a strong tide, at a speed of about two miles an hour. The two vessels made each other about five hundred yards apart.　From this statement of their respective headings it is quite evident, and the court also finds as a fact, that they were upon crossing courses; that the Packer had the Wolverton on her starboard side, and was bound, under the 19th Rule of § 4233, to keep out of her way.

In fulfilling this obligation, however, she was entitled to act, within the limitations imposed by the requirements of good seamanship, upon the judgment of her master, and to put her helm to port or starboard; and there was a correlative duty, no less imperative, on the part of the Wolverton "to keep her course."　Rule 23.　*The Sea Gull*, 23 Wall. 165, 176; *New York &c. Steamship Co.* v. *Rumball*, 21 How. 372, 384; *The Adriatic*, 107 U. S. 512, 518.　While this duty of avoidance is ordinarily performed by porting and passing under the stern of the other vessel, and while this is evidently, under ordinary circumstances, the safer and more prudent course, cases not infrequently occur where good seamanship

sanctions, if it does not require, that the manœuvre shall be executed by starboarding and crossing the bows of the approaching vessel. Of course, in doing this the steamer takes the risk that the approaching vessel, while fulfilling her own obligation of keeping her course, may reach the point of intersection before she has passed it herself; and hence at night, or in thick weather, the manœuvre would be likely to be attended with great danger. In the present case, however, there were circumstances which indicate that the selection of this course may have been such an exercise of discretion upon the part of the master as was not inconsistent with sound judgment and good seamanship. It was broad daylight, the weather was clear, and a careful lookout could not fail to hear the signals of an approaching vessel, and to estimate properly her course, her bearings and her distance. There was a strong tide ebbing out of the East River, and the Packer was making her way slowly and with some apparent difficulty against it. It was obviously to her advantage to keep as near to the piers, heading as she was directly against the tide, as it was possible to do, since such a decided porting as would be necessary to avoid the Wolverton and her tow would have compelled her to take the full force of the tide upon her port side, and exposed her to a strong outward drift, as well as to the probability of the Atlanta sagging down upon her. Whether the starboarding of the Packer was a fault or not would depend largely upon the question whether, assuming that the Wolverton kept her course and maintained her then rate of speed, either vessel would pass the point of intersection before the other reached it. If it were clear that no collision would have occurred had the Wolverton kept her course, then the starboarding of the Packer was not a fault, since the point of intersection would either be ahead or astern of the Packer. But if such starboarding was likely to involve risk of a collision, then of course it was a fault.

It was suggested upon the argument that there was a rule of the supervising inspectors, making it obligatory upon a crossing steamer to avoid the one having the right of way by porting her helm in all cases. But no such rule is incorporated

in the record or in the briefs, and it is not a regulation of which we can take judicial notice. But even if such rule were proved, it is by no means clear that the circumstances of this case would not bring it within the exception contained in the 24th Rule of "special circumstances" requiring a departure from the general regulations.

Whether the Packer was guilty of fault in starboarding or not, the duty of the Wolverton was clear. She was bound (1) to keep her course, and (2) to check her speed, if there was apparent risk of a collision, and, if necessary to avoid immediate danger, to stop. She did neither. The 8th finding is that "the vessels saw each other when about 500 yards apart;" and the 9th, that "as soon as the Packer saw the Wolverton she blew two blasts of her steam whistle. She was then under a starboard wheel and making in somewhat toward the end of the piers.". There is no finding whether the signals of the Packer were heard by the Wolverton or not; but it is fairly inferable that if the whistles were blown at a distance of 500 yards they would be or ought to have been heard, and under such circumstances the porting of the Wolverton was a gross fault, unless it can be excused by the imminence of the peril. *The Corsica,* 9 Wall. 630. The 10th finding bears upon this point and is as follows: "At the time the Wolverton ported her helm, danger of collision was imminent and a collision seemed unavoidable." It is difficult to give a satisfactory interpretation to this finding. While it is a familiar law of collision that a wrong order given *in extremis,* or, as some of the authorities say, "to ease the blow," will not be treated as a fault, such principle manifestly has reference to a collision between the vessel guilty of the wrong order and the approaching vessel. Now no such collision took place in this case, since it was the Atlanta and not the Wolverton which received the blow. It would seem, too, the finding that the collision "seemed unavoidable" could not have had reference to a collision between the Packer and the Atlanta, since the latter was 150 feet astern of the Wolverton, and to bring about a collision between her and the Packer, or the Packer's tow, (which being lashed alongside may be treated as identi-

cal with the Packer,) it was necessary for the Wolverton to cross from the starboard to the port bow of the Packer, and to drag the Atlanta under the bow of the latter. Indeed, it seems impossible to exonerate the Wolverton in view of the other finding, that the vessels saw each other when about 500 yards apart, and that, as soon as the Packer saw the Wolverton, that is, at this distance of 500 yards, she blew two blasts of her steam whistle. Hearing this signal as she did, or as she was bound to do, the porting of the Wolverton must almost of necessity have brought about a collision. The whistle was a signal to her that porting was the one thing she must not do. If, in fact, as testified by her pilot, the Wolverton ported four or five points before the collision took place, it not only disposes of the 10th finding but shows that the collision was largely, if not wholly, the fault of the Wolverton.

The Wolverton seems also to have been at fault for excessive speed. If the officer in charge were satisfied that the signals of the Packer and her apparent starboarding were an error and involved a risk of collision, it was his duty, under Rule 21, to slacken speed before crossing her bows, or, if necessary, to stop, or even to reverse, if it could be done without danger to tow. This rule was applied by the House of Lords to a collision between crossing vessels in the recent case of *The Memnon*, 62 Law Times (N. S.), 84; *S. C.* 6 Asp. Mar. Law Cases, 488, wherein it was declared to be the duty of the vessel entitled to keep her course to comply with the rule as to slackening speed, or stopping and reversing, if necessary, and if she does not do so, the burden is upon her to show that to continue her speed was in fact the best and most seamanlike manœuvre under the circumstances. It is not easy to see how, under any view of the facts, the Wolverton can be exonerated from fault in this particular.

It appears from the bill of exceptions that, after the Circuit Court had made its findings of fact in this case, eight additional findings were submitted by the claimant, which the Circuit judge declined to find otherwise than he had already found, except with regard to the compass course of the Wol-

verton, which he had found to be N.W. by N. by mistake. We have already held that the Circuit Court is bound to find all such facts as are material and necessary to a correct determination of the question of liability involved. Upon examination of these proposed findings in connection with the evidence set out in the bill of exceptions, we think that most of them are immaterial, or are covered by the findings actually made. The sixth, however, is important, and reads as follows: "The porting of the Wolverton's wheel when she was about 200 feet from the Packer was a change of four or five points from her course." We think the claimant was entitled to a finding in regard to this point. It would also have been more satisfactory if the court had found the number of points the Packer swung under the order to starboard given "upon signalling the Wolverton," as found in the ninth finding. But as no request was made for a finding upon this point, and no exception taken to the omission, it is now too late for the claimant to demand it.

*The decree of the court below will be reversed, and the case remanded for further proceedings in conformity with this opinion.*