## THE H. F. DIMOCK.

## METROPOLITAN S. S. CO. v. VANDERBILT et al.

## VANDERBILT v. METROPOLITAN S. S. CO.

(Circuit Court of Appeals, First Circuit. September 16, 1896.)

### Nos. 148 and 149.

1. COLLISION—NARROW CHANNEL—FOG—EXCESSIVE SPEED.

A steamer passing through a narrow and much-used thoroughfare in a dense fog must slow down to such a speed as is consistent with the safety of other vessels navigating the channel; and, if such speed does not afford sufficient steerage way, she should come to anchor. The Pennsylvania, 19 Wall. 125; The Nacoochee, 11 Sup. Ct. 122, 137 U. S. 330; The Martello, 14 Sup. Ct. 723, 153 U. S. 64, followed.

2. SAME—VESSEL AT ANCHOR IN CHANNEL.

If a steamer going at dangerous speed in a narrow channel in a dense fog collides with an anchored vessel, she is not relieved from liability by the fact that the latter was anchored in the channel, having come to anchor because of the fog.

3. SAME—STEERAGE WAY.

A steamer which enters a narrow thoroughfare in a dense fog, instead of waiting for the fog to lift, cannot excuse herself for maintaining a dangerous rate of speed therein on the ground that such speed was necessary in order to maintain her steerage way and courses, and that this fact constituted a "special circumstance," within the meaning of article 23 of the international rules.

4. SAME—STATUTORY REGULATIONS—JUDGMENT OF MASTER.

Where nonobservance of a statutory regulation by a steamer is the cause of collision, she cannot be excused from liability because her master acted with honest judgment under the circumstances.

5. SAME—MEASURE OF DAMAGES—PLEASURE YACHT.

In case of the total loss by collision of an expensive pleasure yacht, for which there is no established market value, the damages should be such as will put the owner pecuniarily in the same condition as before the injury; and, in estimating such damages, the original price of the ship, and its condition at the time of the loss, should all be considered. An inquiry of practical value would be, what amount a person of sufficient means, desiring to acquire a yacht of her size and character, might reasonably be expected to be willing to pay for the same rather than incur the cost of a new structure, considering, nevertheless, the inducements to secure the new, by reason of probable improvements and other advantages which the new offers.

6. SAME—COSTS.

In a suit to determine the liability of vessels in collision, the court can make no order in respect to the costs incurred in an original proceeding in the supreme court to prohibit the court having cognizance of the collision suit from entertaining jurisdiction thereof, the writ of prohibition having been denied.

7. SAME—STIPULATION IN LIMITED LIABILITY PROCEEDINGS.

A vessel owner who, in proceedings for limitation of liability, desires to give a stipulation in lieu of transferring the vessel to a trustee, must pay the taxable costs incident to giving the stipulation, including the expense of making the appraisal.

8. SAME.

In limited liability proceedings, the costs arising on every contested issue should fall on the losing party; but the expenses of administration, including the fees and other charges of the officers of the court and of the commissioner, should be paid from the fund, unless and so far as parties have made issues, and as to this exception the owner stands in the same condition as any other party. All such costs of adverse issues should be

taxed without reference to the fund or its existence, the same as the costs of any entirely independent litigation.

9. SAME—INTEREST—WHEN ALLOWED.

In cases of limited liability, interest will only be allowed on the appraised value from the date of the decree until payment, and in the event of an appeal by the owners, which is unsuccessful, such interest will be decreed against them, in personam, and not against the stipulators.

Appeals from the District Court of the United States for the District of Massachusetts.

This was a petition by the Metropolitan Steamship Company for limitation of liability for collision between their steamship H. F. Dimock and the yacht Alva, at the same time denying liability; and a libel by William K. Vanderbilt, as owner of the yacht Alva, against the Metropolitan Steamship Company, for damages arising from the same collision. A decree was rendered limiting liability to the value of the steamship H. F. Dimock and her freight, holding such steamship liable for the collision, and awarding damages in amount much more than the limitation of liability, and both parties appeal.

John Lowell and Wm. D. Sohier (Robert D. Benedict and Eugene P. Carver with them on brief), for Metropolitan S. S. Co.

Frederic Dodge and Harrington Putnam (Edward S. Dodge and George E. P. Howard with them on brief), for Wm. K. Vanderbilt.

August Reymert and Frederic Dodge also submitted a brief for eight sailors of the Alva, damage claimants with William K. Vanderbilt, appellees in No. 148.

Before COLT and PUTNAM, Circuit Judges, and WEBB, District Judge.

PUTNAM, Circuit Judge. The general facts involved in these appeals were stated by the learned judge of the district court as follows:

"This collision occurred in Pollock Rip Slue, on Nantucket Shoals, between 8 and 9 o'clock in the morning of July 24, 1892, in a fog of great density. The Alva was a large steam pleasure yacht of steel or iron, and at the time was going from Bar Harbor to New York, with the owner and his guests on board. The Alva entered the Slue, and when about half way through the Slue ran into a fog bank of great density, and the master of the yacht, feeling that it was prudent not to go further, came to an anchor. The Dimock belonged to the Metropolitan Steamship Company Line, running between New York and Boston, and at this time was on her way from New York to Boston. The Alva was headed to the westward, and the Dimock struck her on the port side, in consequence of which the Alva was sunk, and was a total loss, but the passengers and the crew escaped."

The Dimock alone was held in fault, but both vessels appealed, the Alva by reason of some minor matters shown by her assignment of errors, and the Dimock claiming that she was not at fault, but that the Alva was.

The Slue is a well-known thoroughfare on the coast of Massachusetts, so much used that very few on our shores are more thronged. It is a dangerous and difficult channel to navigate, because of the swift tide, the direction of which is constantly changing, and of dangerous shoals on either hand. But it is claimed by the Dimock that there is an abundance of safe anchorage ground

on either side of the Slue, more out of the course of vessels than the Alva lay, and good anchorage before entering it, coming down from the north as the Alva did. She also claims that the Alva's place of anchorage was but a little on the east side of the middle of the channel, in five fathoms of water, which, it is said, is the greatest depth, and almost directly on the course through the Slue going north.

The fog is characterized by the Dimock's master as an "open and shut fog." He describes its density in various ways; but it is sufficient for the purposes of this case that he admits that, when he sighted the Alva, she was only about 250 feet from his pilot house. On the part of the Alva, the testimony as to the fog conforms substantially to that in behalf of the Dimock. Her master testifies that, before the Alva entered the Slue, the early fog had cleared, but that, as she was entering it, a new bank rushed in suddenly,—"a defined wall," "much more dense than an average fog"; that as soon as he encountered this bank he slowed down, and almost immediately thereafter stopped; that, hoping the fog would lift, he allowed his vessel to drift five or six minutes, but he found that she was setting to the eastward, so that, the fog not lifting, he came to anchor.

On the clear facts as to the fog, there can be no question that the Dimock was in fault for excessive speed in this thoroughfare, whatever may be the rule on the open ocean. The Nacoochee, 137 U. S. 330, 339, 11 Sup. Ct. 122, 125, stated the principle which must govern us. After citing The Batavier, 9 Moore, P. C. 286, the court said:

"The rule laid down in the last-named case is that, at whatever rate a steamer was going, if she was going at such a rate as made it dangerous to any craft which she ought to have seen, and might have seen, she had no right to go at that rate."

It is true that the court did not in express terms adopt the rule thus stated. It is also true that The Nacoochee may not be precisely in point for a collision like this at bar, because in that case the steamer was aware of a sailing vessel in the vicinity, so that she was probably subject to the more definite rule given in The City of New York, 147 U. S. 72, 84, 13 Sup. Ct. 211, 216, and in other cases of that class. The court, however, referred to The Pennsylvania, 19 Wall. 125, 134, and fully recognized it. There the rule was applied positively to a vessel in the neighborhood of Sandy Hook to the same effect as stated incidentally in The Nacoochee, according to our citation from the latter case, and the court also made the following statement, applicable to some of the circumstances of the two appeals at bar:

"It is true her master, while admitting she was going seven knots, states that he does not consider she could have been steered going slower,—could not have been steered straight. And two other witnesses testify that, in their opinion, she could not have been navigated with safety and kept under command at a less rate of speed than seven miles an hour. These, however, are but expressions of opinions based upon no facts. They are of little worth. And, even if it were true that such a rate was necessary for safe steerage, it would not justify driving the steamer through so dense a fog, along a route so much frequented, and when the probability of encountering other vessels was so great. It would rather have been her duty to lay to."

The Martello, 153 U. S. 64, 70, 14 Sup. Ct. 723, 725, does not change the position. The court there, with reference to a steamer just out from New York, and about two miles to the northward and eastward of the Sandy Hook lightship, in a fog at 8 o'clock in the morning, said:

"Under such circumstances, and in such a fog that vessels could not be seen more than a quarter of a mile away, it is not unreasonable to require that she reduce her speed to the lowest point consistent with a good steerage way, which the court finds in this case to be three miles an hour."

It is plain that the fog was not so dense as this at the time of the collision at bar. In view of the necessity of protecting life in thoroughfares like the Slue, we must apply the rule which we have cited from The Nacoochee to vessels navigating them, even though it be inapplicable on the open ocean. In view of this conclusion, we do not find it necessary to examine the testimony as to the Dimock's speed at any length. It is admitted to have been at least from 4½ to 5 knots through the water. If the tide is to be added to this, she was making from 7 to 8 knots by the land; but, however this may have been, her admitted speed, under the rule as stated in The Nacoochee, even as applied in The Martello, was too great. She claims that it would have been impossible for her to have maintained at less speed her steerage way and her courses in the Slue on account of the tide; and she relies on this fact as raising "special circumstances," under article 23 of the International Regulations of 1885, which are undoubtedly applicable to the waters where this collision occurred. If she had been compelled to navigate the Slue, the "special circumstances" would require consideration; but, as she struck the fog before she entered it, and could have come to anchor, as the Alva did, no special circumstances excuse her, and the duty imposed by The Pennsylvania, already cited, required her to find some protection against the possibility of this collision. That the Alva was anchored in the channel of the Slue, if she was so anchored, in no way excused the Dimock; because the duty imposed on the latter to come to anchor, unless she could run at the safe speed stated in the rule cited from The Nacoochee, required her to guard against this possibility, as well as against that of meeting sailing vessels beating up or down, or disabled steamers or other disabled craft. She was so clearly guilty of an error in this respect, without which the collision could not have occurred, that we need not consider the other faults alleged against her.

We are aware that the master of the Dimock appears to have been competent for his position, and to have exercised an honest judgment, and, indeed, to have proceeded even more carefully than other steamers navigating practically in company with him. Where the questions are merely those of prudential rules of navigation and of maritime usages, a vessel should not ordinarily be held in fault simply because the courts, with cool deliberation, after all the facts, determine that what was done was mistaken. In such cases a court should put itself in the position of the master at the time of the circumstances involved, and consider that the rights of the parties, when maritime contingencies are difficult and un-

usual, must ordinarily be settled according to his determination, provided he has suitable experience and capacity, and exercises a discretion not inconsistent with sound judgment and good seamanship. The E. A. Packer, 140 U. S. 360, 367, 11 Sup. Ct. 794, 796. We adhere to the rule laid down by us in The Charles L. Jeffrey, 5 C. C. A. 246, 55 Fed. 685, 686, that, when everything about the case indicates a reasonable degree of vigilance, the probability that the ship complied with her duty is prima facie established; but here we are dealing with an injunction of the statute, from which the court cannot excuse the Dimock. In Belden v. Chase, 150 U. S. 674, 698, 14 Sup. Ct. 264, 272, it is said that the statutory rules, and also those made by the supervising inspectors by authority of the statute, are not mere prudential regulations, but are obligatory. To such an extent is this enforced that the supreme court, in The Pennsylvania, 19 Wall. 125, 136, apparently adopted the English rule, that the burden rests on a ship to show, whenever she disregards the statutory regulations, not merely that such disregard might not have been one of the causes of the collision, or even that it probably was not, but that "it could not have been." This was apparently restated in Belden v. Chase, at page 699, 150 U. S., and page 272, 14 Sup. Ct., in The Martello, 153 U. S. 64, 74, 14 Sup. Ct. 723, 726, and in The Britannia, 153 U. S. 130, 143, 14 Sup. Ct. 795, 799. To understand this strictness, it is necessary to observe that, where it appears that a vessel has only neglected the usual and proper measures of precaution, but has not violated any statutory regulation, the burden resting on her to show that the collision was not owing to her neglect as the efficient cause is only the ordinary one. The Great Republic, 23 Wall. 20, 34. If there were any doubt that the fault of the Dimock led to the collision, the authorities to which we have referred would probably hold her; but we have cited them, not on that account, as there can be no question here on the matter of proximate cause, but to show the stringency of the rule which prevents us from excusing her merely for the reason that the master acted with an honest judgment under the circumstances of the case.

Referring to the matter of "special circumstances" provided for in article 23 of the International Regulations of 1885, the court said, in The Maggie J. Smith, 123 U. S. 349, 354, 8 Sup. Ct. 159, 161, as follows:

"It applies only where there is some special cause rendering a departure necessary to avoid immediate danger, such as the nearness of shallow water, or a concealed rock, the approach of a third vessel, or something of that kind."

To put it into a somewhat different form, the court said, in Belden v. Chase, at page 698, 150 U. S., and page 271, 14 Sup. Ct., referring to the statutes and the supervisor's rules, as follows:

"Nevertheless, it is true that there may be extreme cases where departure from their requirements is rendered necessary to avoid impending peril, but only to the extent that such danger demands."

So, in The Oregon, 158 U. S. 186, 202, 15 Sup. Ct. 804, 811, it was said:

"Exceptions to these rules, though provided for by rule 24" of the Revised Statutes, "should be admitted with great caution, and only when imperatively required by the special circumstances of the case."

Indeed, taking it altogether, these expressions go but little, if any, beyond applying the rule of in extremis. That the exceptions thus made by the supreme court in the construction which it gives to rule 24 of the Revised Statutes, and to rule 23 of the International Regulations of 1885, do not apply to the Dimock, is very evident, because, as we have already said, she was under no necessity of proceeding immediately through the Slue, and she could have anchored, as the Alva did.

We now come to the faults charged against the Alva. They relate to her not anchoring before she entered the Slue, to anchoring in an improper place, to lack of a sufficient pilot or navigator, to her not giving special signals, and to her not paying out her chain to ease the collision. As we are of the opinion that the district court did not overvalue the Alva, all questions touching her alleged faults are of no practical importance. Therefore we pass them by, except only to remark our general concurrence in the views of the learned judge of the district court, barring the matter of lack of special signals on the part of the Alva when she perceived, as she did perceive, that the Dimock apparently did not hear those expressly required by statute, and was constantly approaching her. Neither on this point, however, nor on any of the points touching the alleged faults of the Alva, do we intend to express any fixed conclusions, and we refer to them only in order that the practical results which we reach shall not be interpreted to mean more than we actually decide.

The proceedings and evidence about the value of the Alva were as follows: She was a steam pleasure yacht, constructed for her owner, William K. Vanderbilt, in 1886 and 1887, by the Harlan & Hollingsworth Company, builders of high reputation, at a cost of from $380,000 to $400,000. She was therefore about five years old, and was a comparatively modern vessel. Her gross tonnage was 1,151.24 tons. She was of 3,400 horse power, and her speed was said to be from 11 to 13 knots. She was built by day labor, with the addition of commissions paid her constructors, making her, of course, an especially costly vessel. There is, however, no evidence that full value was not obtained for the money paid out in her construction; so the method by day labor affords no presumption, except in favor of thoroughness and fidelity of work. It is true that Lord, a steamship broker, testifies that, "at the time the Alva was built, a vessel of her description, equally good in every respect, could have been built for at least 15 per cent.—15 to 20 per cent.—less than the price paid for" her; but he shows no knowledge of the Alva sufficient to base any such opinion on with positiveness, and the diminution he makes in this respect is inconsequential in view of the very great reduction made by the district court. Lord also testifies that her engines were of an obsolete style, and her coal consumption large, and that these facts would give a large depreciation in her value. He says, in reference to these particulars, that she had not sufficient speed to make her a fast boat, and that her large consumption of coal would take her out of the class of auxiliary steam yachts, "so that she could neither be called an auxiliary yacht or a speedy one." He also adds that

he thinks "that probably it might have been advisable to have taken those engines and boilers out, and replaced them with modern engines and boilers." All this, however, must be taken in a qualified sense, and, moreover, ·it is evidently given without thorough knowledge of the Alva or her construction, and is partly based on facts which are assumed in the examination of the witnesses and not proven in the record. It is improbable that constructors of the reputation of the builders of this vessel should, under the circumstances, have launched a yacht which would have grown obsolete in five years, or so soon proven insufficient, or have depreciated for practical use except in accordance with the ordinary and inevitable progress of marine architecture. The reduction in value made by the district court of fully one-half of the cost of this vessel affords ample allowance to cover all the suggestions made by the witness Lord, giving them the broadest effect which practical sense will permit us to do. The steam yacht Atalanta, about three years older than the Alva, of somewhat less tonnage, of superior speed, and, as one witness says, for the general market almost equal to the Alva, if not quite, was on sale at a time not named, for about two years, at $150,000, and not sold. Other evidence offered by the Dimock consists of the opinions of Hughes and Borrows and also of Lord. Neither of them had any personal knowledge of the Alva, except of the most general character. Hughes is a yacht broker. He does not attempt to give the market value of the Alva; but, on the other hand, he says that there is no market for vessels like her. He also says that the highest price ever paid for a yacht was $105,000, which was on a purchase of the Sagamore, being more than she in fact cost. Borrows is a general steamship broker, and he values the Alva at about $130,000. Lord, of whom we have already spoken, values her at from $80,000 to $90,000. It is apparent, however, that the evidence of Borrows and Lord was controlled by their knowledge of sales of merchant steamers, which, at the times in question here, especially if they were of a somewhat obsolete type, were generally sold for very moderate sums. Mr. Vanderbilt testifies that, at some little time before the collision, he had been asked what he would take for the yacht by several parties, and that he replied $300,000, but that he stated to one friend that he would take, if he could get an offer in cash, $275,000. He adds that that was the lowest which he would have taken. While these facts are in the record, of course they are not legitimate proof. Mr. Vanderbilt also testifies that the Alva had not suffered more than the ordinary and usual depreciation, and that she had been thoroughly kept up, and that a great deal had been spent on her in repairs, in keeping her in a thoroughly first-class condition. The Dimock practically admits a value of $125,000. This is substantially all the evidence there is in the record, and, of course, is far from satisfactory; and, from the very nature of the case, it would seem that nothing except proof of a meager and general character could be expected.

The matter of values was passed on by a commissioner appointed by the district court, who seems to have given it very careful attention, and who fixed that of the Alva at $190,000, not including

her boats, which were saved. To this was added $5,000 for the personal effects of the owner; and there was deducted as the value of the wreckage $3,500, leaving net $191,500. The district court accepted this valuation, the learned judge, however, remarking that he did not agree with the commissioner in his rule for assessing her value "at what she was worth to the owner." He adopted the rule of "her market value just before the loss"; but he added that, "even under the latter rule, the estimate of the commissioner was as near her value as it was possible to arrive." It is quite probable, looking at the whole report of the commissioner, that, notwithstanding this peculiar expression, he had substantially the same view of the law as that stated by the district court; and it is also quite probable that the district court, notwithstanding it uses the expression "market value," intended rather to distinguish against what it cited from the commissioner than against the view of the law which we think we ought to adopt. As both this court, the learned judge of the district court, and the commissioner reach the same result, it may not seem necessary to dwell on the rules of law which control us; yet it is prudent to do so. What was said by the learned judge of the district court leads up, first of all, to the distinction which marks the limited class with regard to which the rule of damages is expressed by the words "pretium affectionis." This rule is defined by a reliable legal lexicographer as follows:

"An imaginary value put upon a thing by the fancy of the owner, in his affection for it, or for the person from whom he obtained it." Bouv. Law Dict.

The testimony of Mr. Vanderbilt, which, we have observed, was not legitimate proof, leads up to this rule of valuation; and the same may be said as to the expression of the commissioner which the district court disapproved. The elements which enter into such a valuation are suggested in Green v. Railroad Co., 128 Mass. 221, 226, 227, an action for the loss of a portrait of the plaintiff's father. The court said:

"The just rule of damages is the actual value to him who owns it, taking into account its cost, the practicability and expense of replacing it, and such other considerations as in the particular case affect its value to the owner."

The court added that "the testimony of the plaintiff that he had no other portrait of his father would bear upon the question of its actual value to him. and was competent."

We need not dwell further on the illustration of this class. It is plain that "pretium affectionis" has no relation to a vessel of the character of the Alva, and that, therefore, the expressions cited from the commissioner and the evidence of Mr. Vanderbilt, to which we have referred, were irrelevant. It does not, however, follow that the proper rule of damages here is simply the market value of the Alva in the usual sense of those words; because the other great division, as distinguished from the class to which "pretium affectionis" applies, includes everything as to which the basis of valuation is that of property as property, and with the rest a vast number of matters with reference to which the rule of mere market value would be unjust or inapplicable. Taking this for the second great class, it is plainly separable into a number of subdivi-

sions. Among them are, first, cases where the rule is strictly the cost of replacing, illustrated by Topsham v. Lisbon, 65 Me. 449, 464, an action for the destruction of the abutment of a bridge built by the town of Topsham, and which it was bound by law to renew. The second embraces cases where the thing injured or destroyed was constructed for a special purpose, and has pecuniary value for that purpose, and for no other. In this class will be found stereotype plates, as explained in Stickney v. Allen, 10 Gray, 352, 356, the value of which is ordinarily to be determined according to the exclusive use to which the plates are to be put by the owner of them, thus bringing into the estimate, as a direct element therein, the cost of replacing them. The same applies to a dredge constructed for special work, and in use for that work, or liable soon to be in use for it, as explained by the supreme court in The Granite State, 3 Wall. 310, 314. Of course, this class embraces such special articles so long, only, as they are in active use, or liable to be called into active use, because, the moment they become obsolete, they cannot ordinarily be valued, except for the mere market worth of the materials or parts into which they may be divided.

The third subdivision, which is the great one, and the one ordinarily spoken of by the courts, covers those articles which have a recognized market value, and as to which the rule of damages is rigidly held to be limited according to such value. With reference to this great class, the cost is no proper element, and, if admitted at all in evidence, it is admitted, not as bearing directly on the value of the article, but only indirectly, when the market is limited, for the purpose of leading up to a determination of what the market value is. But with reference to all the other subdivisions already described, the cost of construction, or of reconstruction, is admittedly an important element for direct consideration in determining the amount of compensation to be awarded.

The fourth and last subdivision is so far akin to the third that it concerns only the present property value, so that the cost of producing or reproducing, although sometimes an important indirect element, is not a direct one in computation, as it is in the first and second subdivisions. In Stickney v. Allen, already referred to, at page 356, 10 Gray, the court said as follows:

"The defendant insists that the market value was the true rule of damages. And this is doubtless the general rule in trover. But this rule presupposes the conversion of marketable property."

It cannot be questioned that the yacht in controversy here was "marketable property," in the general sense of the term; so that this precise expression, apparently used somewhat loosely, does not reach the case we have to deal with. We find the rule, however, repeated elsewhere with exactness. In Green v. Railroad Co., 128 Mass., at page 226, the supreme court of Massachusetts uses the same expression over again, but in such connection that it is evident it had reference, not merely to property not marketable, but to property which has no market value in the proper sense of those words. The court there said:

"The general rule of damages in trover, and in contract for not delivering goods, undoubtedly, is the fair market value of the goods. But this rule does

not apply when the article sued for is not marketable property. To instruct a jury that the measure of damages for the conversion or loss of a family portrait is its market value would be merely delusive. It cannot with any propriety be said to have any market value."

In Williams & Bruce's Admiralty Practice (2d Ed.), it was said, at page 97, with reference to a ship totally lost, as follows:

"In ordinary cases the market value of the ship immediately before her loss may be regarded as a fair measure of her value. But, in the case of a ship adapted only for special purposes, and of such an exceptional character as to be in fact unmarketable, some other criterion must be adopted. In these cases the court will endeavor to arrive at the real extent of the loss sustained by calling to its aid every circumstance which may assist it to form a correct estimate, and the original price of the ship, its condition at the time of the loss, and the sum for which the plaintiff could have got such another ship built, may be very important matters in the calculation."

But the supreme court, in The Granite State, already referred to, at page 314, 3 Wall., although speaking more particularly of the dredge in controversy in that case, very clearly made the distinction to which this fourth subdivision relates, as follows:

"There cannot be an established market value for barges, boats, and other articles of that description, as in cases of grain, cotton, or stock."

While the value of the Alva is not to be determined as are the limited range of articles in the first class we have named, by the rule of "pretium affectionis," and while she is not entitled to the special rules relating to articles in the first and second subdivisions of the second class, where the cost of reproducing is a direct element, and, although it cannot be said she is not marketable in every sense of the term, and although we can look only at her property value in the ordinary meaning of that expression, yet, evidently, a yacht of her size and construction and fitting has no market value, in the sense in which those words are used with reference to the articles of the third subdivision; that is to say, it is apparent that she does not fall within the class of articles which are sold from day to day, so that frequent current market transactions will enable the owner, if he desires to sell, to obtain, within a reasonable time, a fair value, or, if he is compelled to replace, to replace at a like fair value. She belongs, rather, to that great mass of property of which dwellings of more than mere moderate cost, erected away from the active centers of thickly-settled cities, and much other property acquired for domestic or personal uses, are fair representatives. To endeavor to determine the value of such property as against tort feasors, or in any case where restitution is to be made, by the mere market value, in the ordinary sense of the term, would work great injustice, and would attempt to maintain a theoretical rule which could not be practically enforced. With reference to all the same, the extract we have made from Williams & Bruce's Admiralty Practice applies, namely, that in such cases "the court will endeavor to arrive at the real extent of the loss sustained by calling to its aid every circumstance which may assist it to form a correct estimate, and the original price of the ship, its condition at the time of loss, and the sum for which the plaintiff could have got such another ship built, may be very important matters in the calculation."

By this it is not intended to go beyond what we have said. It is still the pecuniary interest which is to be valued, and not merely

the minimum sum at which the owner of property of this class might, for special reasons, be willing to dispose of it. Some of the courts have said that in all such cases no defined rule could be given, but that the jury, if the jury is to assess the damages, must determine for itself, within reasonable limits, and subject to the general observations which we have named. We think it safe, however, to say that, with reference to property of this class,— and in this case the Alva herself,—one inquiry of practical value would be, what amount any person of sufficient means, desiring to acquire a yacht of her size and character, or any other property of a special kind, might reasonably be expected to be willing to pay for the same, rather than incur the cost of a new structure, considering, nevertheless, the inducements to secure the new, by reason of the probable improvements and the other advantages which the new offers. In working on that line, it is evident that all the elements stated in the extract we have made from Williams & Bruce's Admiralty Practice come in play, although none of them would be controlling, and each of them might depart very widely from the measure of valuation to be finally adopted. In cases of insurance, the rule is said to be one of indemnity; and, undoubtedly, with reference to insurance on buildings of the class which we have described, the market value of the property burned seldom fixes a fair rule of adjustment. In Washington Mills Manuf'g Co. v. Weymouth Ins. Co., 135 Mass. 503, 506, the court said as follows:

"So the market value of the property burned is not always a fair rule of adjustment. The contract of the insurer is not that, if the property is burned, he will pay its market value, but that he will indemnify the assured; that is, save him harmless, or put him in as good a condition, so far as practicable, as he would have been in if no fire had occurred."

It is true that in insurance the rule is one of indemnity, but it cannot be said to be less in cases of collision. The rule here is admittedly that of "restitutio in integrum"; and, indeed, so liberal a restitution is made that the admiralty gives the owner of the vessel injured benefits given nowhere else, as, for example, the value of pending freight, and, what is of more importance, in case of partial injury, the cost of repairs, without any deduction on account of new for old. Mars. Mar. Coll. (3d Ed.), at page 111, contains a full statement of this rule.

It is very apparent that, in the case at bar, the owner of the Alva would fall far short from being put "in the same condition as if the injury had not been suffered," if the narrow rule of market value was adopted. We therefore think that she falls within the fourth subdivision, and that all the elements to which we have referred as admissible concerning the valuation of articles belonging to that subdivision are to be considered. In view of this conclusion, we are unable to hold that either the learned judge of the district court or the commissioner should have gone further than he did, which was to reduce by one-half of her original cost the value of this vessel, only five years old, kept, as the record shows, in the best condition of repair. We think that such a reduction makes ample allowance for every consideration which

could be urged against her, including all those suggested by the testimony of Mr. Lord. We are certainly unable to revise with any satisfaction to ourselves the value thus put on her in the district court. The result is that, as the district court valued the Dimock and her pending freight at only $92,000, from which valuation no appeal has been taken, the final decree in that court falls a little short of providing for one-half of the loss which we have thus determined was suffered by the Alva, disregarding the additional minor losses which bring the gross damage suffered to $196,327.35. Consequently, as we have said, no practical advantage would come from our determining whether or not the Alva was in fault; so that, without passing on that question, we can so far leave the conclusions of the district court undisturbed.

We have thus disposed of the important questions which this record raises; but many minor ones have been submitted for our consideration. We will endeavor to overlook none of them. The Dimock alleges additional errors as follows:

"(25) That the judge erred in refusing to order the costs and expenses of the prohibition proceedings to be paid from the fund, or to be paid by the claimant, William K. Vanderbilt. (26) That the judge erred in not restraining from proceeding in this cause until said costs and expenses were paid."

We understand that this refers to one of the two cases reported under the title of In re Morrison, 147 U. S. 14, 13 Sup. Ct. 246. The costs in that proceeding were not properly in issue here, any more than would be the costs in any extraneous litigation, and the refusal of the district court to make any order about them was right.

Other alleged errors are as follows:

"(27) That the judge erred in refusing to order the costs of the appraisal and other proceedings connected with the petition to be paid from the fund. (28) That the judge erred in refusing to order that the costs of the revaluation and appraisal be paid from the fund, or be paid by the claimant, Vanderbilt."

These sufficiently explain themselves. The stipulation is a privilege given to the owner in lieu of the transfer of the vessel to a trustee, and, whether so or not, in order that the owner may obtain the benefit of the statute, he must obtain a proper status in court, and leave a fund which can be distributed by it. If he desires to give a stipulation for that purpose, as the appraisal is necessarily a condition precedent to giving a stipulation, he cannot get his fund into court without paying the taxable costs of the stipulation. This falls upon him quite as much as would the expense of the execution of a bill of sale to a trustee, and the services of his proctor in applying to the court in reference thereto. As in this case the value of the vessel was increased on the reappraisal, it follows that the owner should pay the taxable costs thereof, as well as those of the original appraisal.

The Dimock has also alleged the following errors:

"(29) That the judge erred in refusing to order that the costs of the damage claimants for proof of claims, commissioner's fees, etc., should be paid from the fund. (30) That the judge erred in refusing to order that the fees of the officers of the court should be paid from the fund. (31) That the judge erred in decreeing that all of these fees, costs and expenses should be paid

by the petitioner in addition to the value of its vessel and the amount of the bond in this case."

It is not easy to make certain what the issues touching these costs were. They are stated one way in the Dimock's objections to their allowance, and another way in the decree. The latter orders generally that the fees of the officers of the court and of the commissioner be paid by the petitioner; that is, the Dimock. The costs arising on every contested issue should, of course, fall on the party losing. Into this class fall the costs of the issues touching the alleged frauds of the Dimock and the Alva; also of the issue whether or not the Dimock was entitled to the benefit of the limited liability statutes, if there had been any contest over it; and also of contesting any claim offered in proof against the fund. The record has brought up an appeal by the Dimock against the allowance of certain claims on the ground that they were not seasonably filed. So far as that issue involved any question in the district court, if it did, in view of the result touching these claims in this court, the taxable costs should be charged against the owners of the Dimock. But, so far as concerns the charges of the commissioner in taking proof of any uncontested claim, they should be paid from the fund, or by the claimant; also, all the fees and other charges of the officers of the court, beyond, as we have already explained, those necessary to enable the owner to get into court the fund representing the vessel, or the stipulation in lieu of it, relate to the administration of the fund, and are payable from it. But this, as already explained, does not affect costs arising as a result of contested issues. Section 4283 of the Revised Statutes provides, under the conditions named in it, that the liability of the owner "shall in no case exceed the amount or value of the interest of the owner in such vessel, and her freight then pending." Section 4285 provides for transferring the vessel and freight to a trustee, and closes as follows: "From and after which transfer all claims and proceedings against the owner shall cease." It necessarily follows, from these closing words that, after the transfer thus authorized has been made, the owner is entitled to depart without day. If he is afterwards retained in court, it is because he voluntarily makes some issue, as has been made here in regard to the alleged faults of the Dimock and the Alva. The payment into court of the appraised value, or the giving of the stipulation in lieu thereof, takes in all respects the place of the transfer of the vessel and freight; so that, after making such payment, or giving such stipulation, the owner is in the same manner entitled to depart without day, except only by attending for the purpose of making good the stipulation at the proper time. To require the owner to pay, therefore, the costs of issues not made by him, but accruing after he has paid in or secured the fund, would be in violation of the letter and the spirit of the statute. The expression in admiralty rule 55, "after payment of costs and expenses," may be of doubtful effect; but the natural construction is in accordance with this expression. The American cases conform to the above views, though, perhaps, the English practice is otherwise. To conclude, all the expenses of administration, including

the fees and other charges of the officers of the court, and the fees and other charges of the commissioner, should be paid from the fund which the stipulation represents, unless and so far as parties have made issues; and, as to this exception, the owner stands not otherwise than any other party. All such costs of adverse issues should be taxed without reference to the fund, or its existence, and they should be made to take care of themselves, the same as the costs of any entirely independent litigation.

The Dimock also alleges the following error:

"(32) That the judge erred in decreeing that the petitioner's limitation of liability should be dependent upon the payment by the petitioner into court of the sum of $92,000, and the above costs, fees, and expenses, as set forth in said decree."

So far as we can perceive, this presents only a moot question, except as covered by our disposition of the other alleged errors.

The Dimock also alleges the following error:

"(21) That the judge erred in allowing certain claimants to file their claims late, after the interlocutory decree, and long after the time mentioned in the monition for filing claims and all the numerous extensions thereof had expired."

This was waived at the argument, but we may add that the Dimock has no interest in the question, as the valuation put on her and her pending freight is not sufficient to pay even a moiety of the amount of the uncontested claims.

We now come to certain alleged errors assigned by the Alva. The first is as follows:

"That the court, upon this appellant's motion for reappraisement and further security, filed February 9, 1893, did not order said reappraisement of the petitioner's interest in said steamship and her pending freight to be had in the manner requested by said appellant in said motion, viz. by reference to a commissioner before whom he and all other parties interested might be at liberty to introduce evidence and to be heard as to the value of said interest, or in such other manner as would secure a proper and sufficient inquiry as to such value, with due opportunity to him and all other parties interested to introduce evidence and be heard thereon, but declined so to order, and did instead issue its warrant to appraise the same, on March 29, 1893, directing said reappraisement to be made by three appraisers therein named, without any opportunity to him or other persons interested to introduce evidence or be heard; whereas, it should have ordered said reappraisement to be made in the manner prayed for in said motion."

This is a mere moot question, as no claim was made at the argument that the owner of the Alva was prejudiced by this form of proceeding. On the other hand, it was expressly stated that counsel were not instructed to ask for a larger valuation.

She also alleges the following:

"(2) That the court, by its order entered July 18, 1895, and its final decree entered August 3, 1895, in accordance therewith, declined to order the petitioner to pay into court interest upon the amount or value of its interest in said steamship and her pending freight, as stipulated by it to be paid into court, in addition to said amount or value itself, according to the stipulations given for the payment thereof into court, but did order said petitioner to pay into court only the amount of said stipulations, or $92,000; whereas, it should have ordered said petitioner to pay into court, in addition to the amount of said stipulations, interest thereon from the time of the giving of said stipulations. (3) That the court, by its order and final decree above referred to, ordered, adjudged, and decreed that upon the payment into court by the petitioner of the amount of said stipulations, without interest, being said sum of

$92,000, said petitioner should be granted the relief it prayed for, and be forever discharged from all claims, demands, and liability arising from or growing out of said collision; whereas, said relief and discharge from all claims, demands, and liability should not have been granted without requiring said petitioner to pay into court, in addition to said $92,000, interest thereon from the time of the giving of the stipulations therefor."

The owner of the Alva does not, in effect, claim this interest against the stipulators for value, but seeks to secure it from the owners of the Dimock, either directly by a decree against them for it, or indirectly by obtaining a refusal of a limitation of liability until the same is paid. Therefore it can hardly be said that the issue thus raised is covered by The Wanata, 95 U. S. 600, 618, or The Manitoba, 122 U. S. 97, 111, 7 Sup. Ct. 1158, 1166. The Alva refers us to The Maggie J. Smith, 123 U. S. 349, 8 Sup. Ct. 159. It will be seen, however, that that case relates generally to interest allowable against owners and claimants, and has no relation to questions which may arise peculiarly in cases of limited liability. Such interest may at times be computable in cases of limited liability for the mere purpose of determining the amounts of the claims to share in the fund under admiralty rule 55; but here the intent is to charge the owner personally, and not merely to increase the provable balance. In view of the principles which governed us in considering the questions about costs, and also of the fact that there has been no tortious withholding of any amount between the time of giving the stipulation and the entry of the final decree, it follows that interest prior to that decree cannot be charged against the owner. This, however, does not involve the question considered by the circuit court of appeals for the Second circuit, in Re Harris, 6 C. C. A. 320, 57 Fed. 244, in regard to the discretionary power to require that the stipulation shall be conditioned for the payment of interest.

We therefore overrule all the alleged errors assigned in behalf of the Alva, and we hold that interest shall be allowed on the amount at which the Dimock and her pending freight were valued by the district court, namely, on $92,000, during the appeal; that is to say, from August 3, 1895, the date at which the final decree was entered, until payment is made, and that, with that exception, no interest shall be allowed against the Dimock, her owners or stipulators. We direct that no interest be cast on any of the claims allowed, because, inasmuch as the value of the Dimock and her pending freight is insufficient to pay the principal of the claims, computation of interest would be a useless labor. The decree for interest will go in personam against the owner of the Dimock, who took this appeal, and not against the stipulators for value, nor will the limitation of liability be made in any way dependent on the same. Except as pointed out in this opinion, we concur in all the proceedings of the district court, interlocutory and final. On each appeal there will be entered the following judgment: The decrees of the district court will be modified in accordance with our opinion filed this day, and the case is remanded to that court for that purpose. Neither party will recover any costs in this court.