CLYDE–MALLORY LINES v. NEW YORK CENT. R. CO.
No. 286.

Circuit Court of Appeals, Second Circuit.
April 6, 1936.

Bigham, Englar, Jones & Houston, of New York City (Leonard J. Matteson and Andrew J. McElhinney, both of New York City, of counsel), for appellant.

Burlingham, Veeder, Clark & Hupper, of New York City (Chauncey I. Clark and Stanley R. Wright, both of New York City, of counsel), for appellee.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

L. HAND, Circuit Judge.

This case arises out of a collision in the North River on the evening of November 13, 1929, between the steamer Neches, bound out for Tampa, and the New York Central tug No. 31, bound up stream, with a carfloat on her left hand. The judge found the tug alone at fault and entered a decree upon the libel of the Neches, dismissing the tug's cross-libel. The collision was at about 5:42 p. m., one thousand feet off the Manhattan pier ends opposite the Pavonia ferry rack, between Piers 19 and 20; it was dark, but the night was clear enough for all practical purposes. The Neches had left her berth, Pier 45, at 5:30, and had got under way headed down stream at 5:33 or 5:35. Her course was about eight hundred feet off the pier ends and she was stemming a flood tide of about two knots. When off Pier 26, or thereabouts, she overhauled the tug, Bush, with two carfloats in tow, bound out and nearer the centre of the stream. After exchanging signals of two blasts, she passed the Bush on her right hand, and found herself faced by the Pavonia ferry, which was crossing from New Jersey into her slip. Being the giving-way vessel as to the ferry, she went under her stern by a quick swing to the right, and in so doing passed so close across the bows of the Bush as to force her to stop and reverse to avoid collision. Not until she had come out from under the ferry's stern did she see the Central tug and tow whose green light and towing lights then appeared on her left bow; at this time the vessels were about one thousand feet apart. The Neches sounded a single whistle, to which the tug blew an alarm, whereupon the Neches backed with a right rudder, and the tug kept on, hoping to clear. The collision was a glancing blow on the tug and carfloat's right quarter.

The No. 31 had made up her tow off the north side of Pier 17. She got under way about two hundred feet from the pier ends and was moving on a diagonal course for the middle of the river, where she meant to turn north to her destination upstream. She saw the Bush and some other lights behind her, which turned out to be the Neches, while she was making up the tow, or certainly as soon as she got under way. She exchanged two blast signals with the Bush, getting consent to cross her bows; she says that she gave the Neches a similar signal a little later, and we will assume that she did, though, as the judge finds and we agree, the Neches never accepted. The two versions do not substantially differ in other respects, except as to the position of the collision, for which we take the judge's finding. He thought that it was a crossing situation in which the Neches had kept her course and speed, and that the tug failed in her duty to keep out of the way.

We cannot absolve the Neches, quite aside from her speed which was probably too great in any event. She failed to make out the tug and tow until she was at most not more than four lengths away and when the situation was already in extremis. It is idle to put forward the ferry as an excuse; she should have seen the tug long before the ferry came between them. The only possible excuse for her is that, as holding-on vessel, she would have had to hold her course and speed, if she had made out the tug in time, and that this is what she did in fact. While she did not indeed hold her heading, choosing rather to go under the stern of the ferry than to slow and let her pass, heading is not "course" under the crossing rule, as we have often declared. The Hallgrim (C.C.A.) 20 F.(2d) 720; Commonwealth & Dominion Line v. U. S. (C.C.A.) 20 F.(2d) 729. This was acutely presented in The Hoboken (C.C.A.2) 59 F.

(2d) 993, which concerned a number of vessels meeting in the North River, some going up and down and one crossing. We held that from the rule that to a giving-way vessel the course of the holding-on vessel is what ought reasonably to be expected of her, it followed that if the holding-on vessel was herself a giving-way vessel as to the third vessel, her course was what she was bound to do to keep out of the way of that third vessel. This sounds complicated, but really it is not; it means no more than that the giving-way vessel is to assume that the holding-on vessel will "hold on" in the manner that her own duties to others require; an entirely practical rule. Since the Neches might go under the ferry's stern, her apparent course was not a straight course. Nor is it an answer to say that she might also have chosen to stop and let the ferry pass; as giving-way vessel, the tug was bound to give her the choice between the two courses which were open to her. We might therefore feel some embarrassment in finding the Neches at fault, aside from her speed, were it not that she was at fault in passing the Bush. She did indeed get leave to pass, and that would have exonerated her had she done so properly, but she did not. Article 24 of the Inland Rules (33 U.S.C.A. § 209) required her to keep out of the Bush's way, instead of which she gave the Bush so narrow a berth as to force her to stop and reverse to avoid collision; so the Bush's master, an impartial witness, swore and nobody denied it. If it was necessary to do so in order to go under the ferry's stern, she had no real choice and it was wrong not to stop and let the ferry pass; her course could not be one which would involve danger to the Bush. If it was not in fact necessary to shave so close in order to go under the ferry's stern, then the Neches did not hold her course, assuming that she had the choice. In either event she was at fault.

 The tug was also at fault. We agree with the judge that the situation was a crossing case, and that the tug was already on a "steady course." She had got her tow alongside when her stern was only two hundred feet off the pier ends, and the collision happened eight hundred feet further out in the stream. In determining the general application of the steaming rules, a "steady course" does not mean an unchanging course, any more than it does as to holding one's course and speed. The last sentence of Rule V, article 18, Inland Rules (33 U.S.C.A. § 203), assumes that the rules apply as soon as an emerging vessel begins to move on her way; its application in The Breakwater, 155 U.S. 252, 263, 264, 15 S.Ct. 99, 39 L.Ed. 139, was in no sense dependent upon the Pavonia's being a ferry. The Central tug here was no longer manoeuvring to get on a course; her course began, not when she headed up stream, but as soon as she was clear to proceed. Decisions like The Transfer No. 18 (C.C.A.2) 74 F.(2d) 256, concern vessels turning or backing before they start away. By the time the tug began to move she was charged with notice not only of the Bush but of the Neches, which was then not over a half mile away, plainly visible inside and not behind the Bush. She exchanged signals with the Bush, but if, as she says, she blew to the Neches as well, she got no answer. It was a fault and a very grave fault to cross her bows; article 22 (33 U.S.C.A. § 207) commands that a giving-way vessel "shall, if the circumstances of the case admit, avoid crossing ahead of the other." Here the circumstances did "admit" the tug's waiting to the east of the Neches's projected course, instead of which she committed herself to the Bush before she had made out the Neches at all, for her lookout was faulty. She could not escape this imperative duty to wait, even though she proved that she would have got by, had the Neches done her duty. The E. A. Packer, 140 U.S. 360, 11 S.Ct. 794, 35 L.Ed. 453, has indeed language looking the other way, but it was decided in 1891 and concerned a collision which happened in 1880. Article 22 (International Rules) was first passed in 1890 (26 Stat. 327, 33 U.S.C.A. § 107); in 1880 the applicable rule was R.S. § 4233, Rule 19 (Red River and North Tributaries Rules, 33 U.S.C.A. § 344), which did not require the giving-way vessel to "avoid crossing ahead of the other"; and this was also true of article 16 of the rules of 1885 (23 Stat. 441). The giving-way vessel might therefore choose in 1880, and the language used in the E. A. Packer, supra, was justified, as the law then stood, though it is so no longer. Cf. The New York, 175 U.S. 187, 193, 20 S.Ct. 67, 44 L.Ed. 126. It is of course always true that if a vessel can show that her fault did not contribute to the collision she will escape, but the tug cannot prove that here; patently her fault

did contribute to the collision since she would have escaped had she not crossed ahead of the Neches.

Decree modified to hold both vessels at fault.