[Civil No. 651.　Filed November 9, 1900.]

[62 Pac. 695.]

## CLINTON B. WISER et al., Plaintiffs and Appellants, v. JOHN LAWLER et al., Defendants and Appellees.

1. APPEAL AND ERROR—ASSIGNMENT OF ERROR—SUFFICIENCY.—An assignment of error alleging that "the district court erred in decreeing that the plaintiffs are entitled to no relief in the case" is too general for consideration on appeal.

2. SAME—SAME—SAME.—An assignment that "the court erred in refusing and rejecting findings of fact, and each of them, submitted

by plaintiffs," referring to nineteen different findings submitted by plaintiffs, only eight of which are presented in the abstract of record furnished this court, is too general and indefinite for consideration upon appeal.

3. SAME—SAME—SAME.—An assignment of error alleging that "the findings of the court are incomplete and erroneous," with no statement of specifications wherein the error or incompleteness consists, is too general to be considered on appeal.

4. APPEAL AND ERROR—EQUITY—REVIEW—SCOPE—DECISIVE ISSUES.— On appeal in an equity case, the appellate court will only look into and review the determination by the lower court of those issues which are decisive of the interests and rights of the parties and controlling in the disposition of the case.

5. ESTOPPEL—MINES AND MINING — PROSPECTUSES — CONTENTS — EVIDENCE REVIEWED.—Defendants contracted to sell a group of mines, title to pass upon full payment of all installments of the purchase price. The purchasers assigned their interest to a corporation, which again assigned that interest to another corporation, both assignments being made subject to the original agreement. The second corporation having failed to pay an installment of the purchase price when it became due, plaintiff, a stockholder therein, sought to estop defendants from asserting title to said mines on the ground that they had been parties to fraudulent prospectuses issued by the corporation. Defendants had known of a prospectus prepared for distribution in England which was fastened to the minute-book of the company. This prospectus was never issued, and did not contain a statement that the mines were owned by the company, and was therefore immaterial. One of the defendants knew that the corporation was about to issue an American prospectus, and while in the office of the company was shown a map of the mines. He testified that he did not see on the map any words stating that the mines were owned by the company, as appeared on a map circulated with the prospectus, and the surveyor who prepared the original map testified that he never placed on said map any such words. The prospectus states: "This company is formed to acquire on October 1st, 1892, . . . the Seven Stars Gold Mine." The evidence only shows that the defendants knew of the preparation and circulation of the prospectus and map. It is not shown that they knew what was contained in said prospectus or on the map or that any duty was imposed upon them to ascertain anything in regard to them. It does not appear that defendants were the authors of any false or fraudulent statements either in the prospectus or on the map calculated to mislead or deceive innocent purchasers or that they or either of them had knowledge of any such statements and the falsity thereof and stood by in silence while innocent purchasers were misled thereby. The facts, therefore, present no case for the doctrine of equitable estoppel.

6. APPEAL AND ERROR—REVIEW—FINDINGS OF FACT—REFUSAL TO FIND EVIDENTIARY FACTS.—The refusal of the trial court to make findings relating merely to evidentiary facts will not be reviewed by this court on appeal.

7. ESTOPPEL—MINES AND MINING—ALLOWING POSSESSION, WHERE IN ACCORDANCE WITH AGREEMENT DOES NOT CREATE ESTOPPEL.—Defendants, having agreed to sell a group of mines, and having given a deed in escrow until final payment of all installments of the purchase price and all rights having been assigned by the original purchasers to a corporation of which plaintiffs were stockholders, and default having been made in the payment of one of the installments, are not estopped to assert their title to the mines by reason of the fact that the corporation was in possession of and working said mines in accordance with the terms of the escrow agreement, the evidence disclosing that the defendants did not know during the time of the occupation and possession of the property by the corporation that the plaintiffs as purchasers of the stock were ignorant of the provisions and the terms of the escrow agreement, or that they as such purchasers had been informed or believed that the corporation owned the title to the mines instead of holding and working them under the license of the escrow agreement.

8. SAME—SAME—RECEIPTS OF RETURNS FROM ORE—BEING IN ACCORDANCE WITH AGREEMENT DOES NOT CREATE ESTOPPEL.—Defendants having agreed to sell a group of mines, and having given a deed in escrow until final payment of all installments of the purchase price, and all rights having been assigned by the original purchasers to a corporation of which plaintiffs were stockholders, and default having been made in the payment of one of the installments, defendants are not estopped to assert their title to the mines by reason of the fact that they have received the returns from the ore obtained from such mines during the ownership by the corporation, such disposition of the receipts from the ore being in accordance with the provisions of the escrow agreement, of which the corporation was fully cognizant.

APPEAL from a judgment of the District Court of the Fourth Judicial District in and for the County of Yavapai. Webster Street, Judge. Affirmed.

The facts are stated in the opinion.

T. W. Johnston, and Kretzinger, Gallagher & Rooney, for Appellants.

In statements sent to the public for the purpose of inducing investments in a corporation, representations of fact must be made with strict accuracy, and no fact material to the

investment should be omitted. Bispham on Equity, sec. 208; *Directors etc.* v. *Kirch,* 2 L. R., Eng. & Ir. App. 113; *Railway Co.* v. *Muggeridge,* 1 Drew. & S. 363; *Edington* v. *Fitzmaurice,* 29 Ch. Div. 459; *Henderson* v. *Lacon,* L. R. 5 Eq. 262; *Hubbard* v. *Weare,* 79 Iowa, 678, 44 N. W. 915.

The prospectus and accompanying documents must be construed together to determine meaning of any part. *Schyville etc. Co.* v. *Moore,* 2 Whart. 491.

The court in reading statements of this character circulated generally among the people will consider how they would influence the ordinary mind. *Railway Co.* v. *Muggeridge,* 1 Drew & S. 363; *Sessions* v. *Rice,* 70 Iowa, 306, 30 N. W. 737; *Arnison* v. *Smith,* 41 L. R. Ch. Div. 359; *Elsworth* v. *Campbell,* 85 Iowa, 532, 54 N. W. 477.

Due weight should be given to the testimony of the large number of persons who say they were led by the statements of the prospectus to believe the company the absolute owner of the mines. *Clark* v. *Dickson,* 95 Eng. Com. L. R. 463.

The public had the right to rely on the prospectus without inquiry. *Bosher* v. *Richmond,* 89 Va. 455, 37 Am. St. Rep. 879, 16 S. E. 360; *Clark* v. *Dickson,* 95 Eng. Com. L. R. 463; *Wilson* v. *Higby,* 62 Fed. 723; *Quirk* v. *Thomas,* 6 Mich. 120; *Morgan* v. *Skiddy,* 62 N. Y. 325; Thompson on Corporations, sec. 1312.

The false representation must be material to the investment, but it need not be the sole inducement. *Morgan* v. *Skiddy,* 62 N. Y. 319; *Peek* v. *Derry,* 37 L. R. Ch. Div. 541; 1 Bigelow on Fraud, p. 544; *James* v. *Hodsohn,* 47 Vt. 127; *Arnison* v. *Smith,* 41 L. R. Ch. Div. 359; *Putsford* v. *Richards,* 17 Beav. 96; *Smith* v. *Chadwick,* 20 L. R. Ch. Div. 27.

The law presumes that subscriptions coming in within a reasonable time after the general circulation of a prospectus were induced by it. "The estoppel will be extended far enough to protect every one who may have been presumed to have acted upon or governed by it." Herman on Estoppel and Res Adjudicata, secs. 794, 795; *Hatch* v. *Spooner,* 13 N. Y. 642; *Bradley* v. *Poole,* 98 Mass. 183, 93 Am. Dec. 114.

Lawler and Wells are estopped to disturb the appearance and representation of ownership of the mines in the Seven Stars Company. *Gill* v. *Griffith & Schley,* 2 Md. Ch. 270; *Wendell* v. *Van Rensselaer,* 1 Johns. Ch. 353; 2 Pomeroy's Equity Jurisprudence, sec. 802; *Jones* v. *Bolles,* 9 Wall. 364;

*Horn* v. *Cole,* 51 N. H. 287, 12 Am. Dec. 111; *Jowers* v. *Phelps,* 33 Ark. 465; *Lucas* v. *Hart,* 5 Iowa, 415; *Anderson* v. *Hubble,* 93 Ind. 570, 47 Am. Rep. 394; Herman on Estoppel and Res Adjudicata, 938, 939, 943, 952, 953, 954; *Nettlewell* v. *Watson,* L. R. 26 Ch. Div. 507; *Carincross* v. *Lorimer,* 3 Macq. App. Cas. 829; *Truesdale* v. *Ward,* 24 Mich. 117; O'Connor v. *Clark,* 170 Pa. St. 318, 32 Atl. 1029; *Bank* v. *Roop,* 48 N. Y. 392; *Hayen* v. *O'Hagan,* 60 Mich. 150, 26 N. W. 861; *Logan* v. *Gardner,* 136 Pa. St. 588, 20 Am. St. Rep. 939, 20 Atl. 625; *Tilton* v. *Nelson,* 27 Barb. 595; *Storrs* v. *Barker,* 6 Johns. Ch. 166, 10 Am. Dec. 316, and note; *Richardson* v. *Hyams,* 1 La. Ann. 286.

The principle of the doctrine of equitable estoppel is honesty and fair dealing, and in its application the court seeks to make the parties do what honesty and fair dealing require. No contractual or fiduciary relation is necessary; knowledge imposes the duty. *Logan* v. *Gardner, supra; Anderson* v. *Hubble, supra; The Ottumwa Belle,* 78 Fed. 643.

Intent to mislead is unnecessary; "fraudulent effect" or "unjust result" is sufficient. *Dair* v. *United States,* 16 Wall. 1, 4; *Hill* v. *Blackwelder,* 113 Ill. 283; *The Ottumwa Belle, supra; Horn* v. *Cole, supra; Anderson* v. *Hubble, supra.*

Presence of title on record is no excuse or justification for acquiescence, participation, and receipt of benefits here shown on part of Wells and Lawler. *Sumner* v. *Leaton,* 47 N. J. Eq. 103, 19 Atl. 884; *Carr* v. *Wallace,* 7 Watts, 394; *Markham* v. *O'Connor,* 52 Ga. 183.

There need be no direct communication between parties claiming the estoppel and the party alleged to be estopped. *Anderson* v. *Hubble, supra; Clark* v. *Dickson,* 95 Eng. Com. L. R. 463; *Kelley* v. *Frick,* 110 Ind. 552, 11 N. E. 453; *Stevens* v. *Ludlum,* 46 Minn. 160, 24 Am. St. Rep. 210, 48 N. W. 771.

"Standing by" does not necessarily mean actual presence. *Anderson* v. *Hubble, supra;* Herman on Estoppel and Res Adjudicata, sec. 954.

Estoppel may arise in favor of one not purchasing directly into the title. The doctrine has been applied for the protection of stockholders and creditors. *Jones* v. *Bolles,* 9 Wall. 364; *Trenton Nat. Bank* v. *Duncan,* 86 N. Y. 222; Herman on Estoppel, sec. 397; *Livermore* v. *Maxwell,* 87 Iowa, 705, 55 N. W. 37.

These persons defrauded in the act of purchasing stock are

under no theory of the law chargeable with notice of what the records of the company disclosed. Even stockholders are not chargeable, as matter of law, with notice of the acts of officers or resolutions of the directors. Thompson on Corporations, sec. 4455; Cook on Stockholders, sec. 731.

A party who receives benefits gained by representations that the title to his property is in another will not be permitted to assert rights inconsistent with the transaction to the injury of the person misled. *Brewster* v. *Baker,* 16 Barb. 613; *Breedens* v. *Stamper,* 57 Ky. 174; *Whittaker* v. *Williams,* 20 Conn. 109.

A party cannot participate in the fruits of a fraud and at the same time repudiate it as not his act. *Texas etc. Co.* v. *Dublin Compress Mfg. Co.,* (Tex. Civ. App.) 38 S. W. 404; *Olmstedt* v. *Hatuling,* 1 Hill, 317; *Cran* v. *Hunter,* 28 N. Y. 389; *Morse* v. *Ryan,* 26 Wis. 356.

"He who receives money or property or a benefit of any kind, under an instrument, whatever its character or his relation to the maker, cannot question the instrument in whole or in part." *In re Peaslee's Will,* 73 Hun, 113, 25 N. Y. Supp. 940; *Havens* v. *Sackett,* 15 N. Y. 365; *Birmingham* v. *Kirwin,* 2 Schoales & L. 444; *Wood* v. *Seeley,* 32 N. Y. 105.

In addition to the foregoing, the following are different applications of the same principle that here estops Lawler and Wells from asserting their legal rights under the Cowland contract to the injury of these purchasers of stock, after having affirmed the representation of title and apparent ownership in the company by receiving the gross proceeds of the company's operation, the fifty thousand dollars in stock, the superintendency of Lawler, and the $112,339.96 sent from New York on behalf of the company. *Field* v. *Doyon,* 64 Wis. 560, 25 N. W. 653; *Leathers* v. *Ross,* 74 Iowa, 630, 38 N. W. 516; *Maple* v. *Kussart,* 53 Pa. St. 348, 91 Am. Dec. 214; Herman on Estoppel and Res Adjudicata, secs. 800, 1063; *McConnell* v. *People,* 71 Ill. 487; *Daniels* v. *Tearney,* 102 U. S. 415; *Franklin* v. *Pollard Mill Co.,* 88 Ala. 318, 6 South. 685; *Swain* v. *Seamans,* 9 Wall. 254; *Fry* v. *Morrison,* 159 Ill. 244, 42 N. E. 774; Robinson v. Elliott, 22 Wall. 513; *Gill* v. *Griffith & Schley,* 2 Md. Ch. 270; *Wendell* v. *Van Rensselaer, supra.*

The concealment of the important terms of a transaction or the secret retention of benefits by a grantor has always

been held sufficient to show the fraud of a transaction and support a decree for the restoration of the property or money of the deceived purchaser or creditor. *Robertson* v. *Elliott,* 22 Wall. 513; *Gill* v. *Griffith & Schley,* 2 Md. Ch. 270; *Wendell* v. *Van Renssellaer, supra.*

That one or two of the stockholders may have purchased with knowledge of the fraud is no defense. Otherwise, to corrupt one would save the fraud. *New Sombrero Co.* v. *Erlanger,* 5 L. R. Ch. Div. 73.

Equitable estoppel is frequently held a ground for affirmative relief. *Jones* v. *Bolles,* 9 Wall. 364; *Kirk* v. *Hamilton,* 102 U. S. 68; *Storrs* v. *Barker,* 6 Johns. Ch. 166, 10 Am. Dec. 316, and note; *Lucas* v. *Hart,* 5 Iowa, 415; *Anderson* v. *Hubble,* 93 Ind. 570, 47 Am. Rep. 394, and note; *Drexel* v. *Berney,* 122 U. S. 241, 7 Sup. Ct. 1200.

The estoppel is commensurate with the representation and operates to put the title where it was represented to be. *Grisster* v. *Powers,* 81 N. Y. 57, 37 Am. Rep. 475; Beach on Equity Jurisprudence, 800; *Trenton Baking Co.* v. *Dinan,* 86 N. Y. 221; *Ellsworth* v. *Campbell,* 85 Iowa, 532, 54 N. W. 477.

A court of equity has power to decree a title to real estate as against a party whose conduct raises an estoppel. *Jones* v. *Bolles,* 9 Wall. 364; *Lucas* v. *Hart,* 5 Iowa, 415; *Kirk* v. *Hamilton,* 102 U. S. 68; *Robbins* v. *Moore,* 129 Ill. 57, 21 N. E. 934; *Stone* v. *Tyree,* 30 W. Va. 701, 5 S. E. 878; *Storrs* v. *Barker,* 6 Johns. Ch. 166, 10 Am. Dec. 316, and note.

Granting that Lawler and Wells may keep the property, it would be so unjust and fraudulent for them at the same time to retain the money that equity will decree its repayment to the stockholders. *Field* v. *Doyon,* 64 Wis. 560, 25 N. W. 653; *Piper* v. *Hoard,* 107 N. Y. 73, 1 Am. St. Rep. 789, 13 N. E. 626; *Day* v. *Brenton,* 102 Iowa, 483, 63 Am. St. Rep. 460, 71 N. W. 538; *Maple* v. *Kussart,* 53 Pa. St. 348, 91 Am. Dec. 214; *Quick* v. *Milligan,* 108 Ind. 419, 58 Am. Rep. 49, 9 N. E. 392; Story's Equity, secs. 1255, 1256; *Third Nat. Bank* v. *Stillwater Gas Co.,* 36 Minn. 75, 30 N. W. 440.

E. M. Sanford, J. F. Wilson, and Herndon & Norris, for Appellees.

The language of the prospectus must be clear and unambiguous as to a fact to constitute a misrepresentation. Fuller,

C. J., in *Farrer* v. *Churchill*, 135 U. S. 609, 10 Sup. Ct. 771, the gist of the action being misrepresentation of title, said: "The representation must be in regard to a material fact, must be false, and must be acted upon by the other party, in ignorance of its falsity." In *Cooper* v. *Schlesinger*, 111 U. S. 148, 4 Sup. Ct. 360, an action for deceit, Blatchford, J., said: "The representation must be deliberately made and in such a way as to give the *person to whom it is made* reasonable grounds for supposing it was meant to be acted upon, and *has, been acted upon by him accordingly.* . . . There must be an assertion of a fact in which a person entering into the transaction relied on, and in the absence of which it is reasonable to infer that he would not have entered into it, or at least not on the same terms. Both facts must concur."

*Slaughter* v. *Gerson*, 13 Wall. 379, is an action to recover purchase price of a steamboat, and it was said: "It must be a representation upon which he relied and by which he was actually misled to his injury."

"A representation the falsity of which will afford a ground of action for damages must be of an existing fact; it must be an affirmative statement or affirmation of some fact, in contradistinction to a mere expression of opinion, which ordinarily is not presumed to deceive or mislead." *Watkins* v. *West & Co.*, 92 Va. 1, 22 S. E. 556. See, also, Cooley on Torts, 555; *Smith* v. *Richards*, 13 Pet. 26; Thompson on Corporations, 1478, 1479; Cook on Stockholders, 355; *Carter* v. *Harden*, 78 Me. 528, 7 Atl. 392; *Stetson* v. *Riggs*, 37 Neb. 797, 56 N. W. 628; *Runge* v. *Brown*, 23 Neb. 817, 37 N. W. 660; *Cox* v. *Highley*, 106 Pa. St. 249; *Columbia Electric Co.* v. *Dickson*, 46 Minn. 463, 49 N. W. 244; *Wheadon* v. *Huntington*, 83 Hun, 371, 31 N. Y. Supp. 913.

The language of the prospectus is ambiguous and puts the investor on inquiry. The prospectus says: "This company presents an unusual opportunity for investors to *acquire* an interest in one of the richest and most extensive gold mines in the world."

Acquire is "to gain; to obtain; to procure." (Webster's Dictionary.) Anderson gives a like definition, and that it is equivalent to "hold," and, relating to property, embraces two ideas, actual possession of some object of property, and being vested with the legal title. It may be applied to any

thing the subject of property, in law or equity, and "property," when applied to land, comprehends any species of title inchoate or incomplete. It embraces rights which lie in contract; those which are executory and those which are executed. *Soulard* v. *United States,* 4 Pet. 512. So possession may be treated as property. *King* v. *Gotz,* 70 Cal. 240, 11 Pac. 656. It is "any thing that goes to make up one's wealth or estate." *Carlton* v. *Carlton,* 72 Me. 115, 39 Am. Rep. 307.

The word "belonging" does not necessarily indicate title. As a verb it is something which concerns or attains to, or the property of. (Webster's Dictionary.) The words "belonging to the same owner" in a statute were construed in *People* v. *Cady,* 105 N. Y. 299, 11 N. E. 810, to not mean the technical owner of the title. *Orr* v. *Goodlow,* 93 Va. 263, 24 S. E. 1014; *Lynch* v. *Murphy,* 50 N. C. 623.

So a statement in a deed "that land is to be paid for in sheep" is sufficient to put one on inquiry. *Bergman* v. *Blackwell,* (Tex. Civ. App.) 23 S. W. 243.

Involving the same principle are *Fredinberg* v. *Lyon Lake Church,* 37 Mich. 476; *Ferson* v. *Sanger,* 8 Fed. Cas. 1153.

"Equity will not relieve a party from the consequences of his own inattention and carelessness in relying upon the representation of another instead of his own judgment." *Gammill* v. *Johnson,* 47 Ark. 335, 1 S. W. 610.

So the meaning of words and terms used in a document must be determined by their known and approved signification; not by the statements of the parties. *Pillsbury* v. *Locke,* 33 N. H. 96, 66 Am. Dec. 713.

DOAN, J.—On and prior to the twelfth day of May, 1892, John Lawler and Ed. W. Wells were the owners and in possession of the mines and mining claims located in the Eureka mining district in Yavapai County, Arizona, known as "Hillside," "Happy Jack," "Contact No. 1," Contact No. 2," and "Camp," and locations known as "Midnight," "Morning Glory," "Water," "Hidden Treasure," "Sucker," "Side," "Purple Rose," "Southern Belle," "Robert E. Lee," "Lucky Cuss," "Centipede," and "Good Enough," which are hereby denominated and will be hereinafter referred to as the "Hillside group of mines." The muniments of title showing such ownership in Lawler and Wells were

then, and have been ever since, on record in the office of the recorder of said county of Yavapai, territory of Arizona, where said mines are situate. Lawler and Wells offered said mines for sale at the purchase price of four hundred and fifty thousand dollars cash. A few days prior to May 12, 1892, H. H. Warner visited this group of mines with T. A. Rickard, a mining expert, and examined the same. After such examination he contracted for the purchase of said group from Lawler and Wells for the sum of four hundred and fifty thousand dollars, paying twenty thousand dollars in cash, the remainder payable in installments, in accordance with the terms of an escrow agreement entered into on May 12, 1892, by and between John Lawler and Ed. W. Wells on the one part and Charles Cowland on the other part, which provided, among other things, that ''the deed conveying the mine to Cowland be annexed to said agreement, and shall be held in escrow with the Bank of Prescott (Arizona), at Prescott, Arizona, to he held and delivered by the bank upon the following conditions only: The bank to deliver the deed to Cowland, his heirs or assigns, upon his or their paying or causing to be paid, as herein provided for, the full sum of four hundred and fifty thousand dollars ($450,000). In case of failure of said Cowland in making or causing to be made any of said payments of money at the time or times and in the manner herein stated, then the said Bank of Arizona, upon demand being made thereupon by said Lawler and Wells, shall deliver said deed to Lawler and Wells, or their representatives; and, in the event of such failure of said Cowland to make or cause to be made any of the said payments, then all payments of money theretofore made by said Cowland on the purchase price of said property shall be forfeited by him, and he agrees and covenants with said Lawler and Wells that all money paid by him as purchase money on said property shall belong to them, and be retained by them as liquidated damages accruing to them for the failure of said Cowland to purchase, take, and pay for said property as hereinabove stated and stipulated, and the said Lawler and Wells shall be at once released and discharged from any further duty or obligation to sell and convey the property. It is further agreed that said Cowland, by himself and his agents, may at once enter

into and upon said property, and take possession thereof, subject, however, to the legal possession of said Lawler and Wells; and the said Cowland may use, possess, explore, develop, work, and operate the said property, and all the proceeds derived from such use, development, operation, and working of the same, and from the ores taken therefrom shall be at once paid to said Lawler and Wells, and be applied to and credited upon the payment hereinabove stipulated to be made by said Cowland. It is further agreed that said Lawler and Wells shall retain and remain in possession of said property until the full payment of purchase price shall be made, and Cowland recognizes and agrees to such possession, and any and all use made of, by, or on the part of the said Cowland shall be considered of said Lawler and Wells' possession as aforesaid. Lawler and Wells shall not work the said property, or operate the said mine, nor interfere with the use, working, and operation of said Cowland. It is further agreed that if the said Cowland shall fail to make the payments as above stated, and shall fail to take and pay for said property as above stated, that all improvements made on said property, and all development made thereon and therein, and all ores taken therefrom, shall be the property of said Lawler and Wells, and shall not be removed by said Cowland, and the costs and expenses thereof shall in no manner be charged against said Lawler and Wells or against said property; that said Cowland shall have the right to work and operate the machinery and to use the property mentioned in said deed during the continuance of said contract and until the forfeiture thereof on his part; and in case of a forfeiture of contract on the part of said Cowland by failure to comply with any of the provisions thereof, or to make any payment as herein provided, then he agrees to at once surrender and deliver possession of said property to said Lawler and Wells.'' On the twelfth day of May, 1892, and contemporaneously with the execution of said agreement, a deed to the said Charles Cowland was executed by John Lawler and Ed. W. Wells and wife particularly describing the said Hillside group of mines, and conveying the same to Cowland for the purchase price of four hundred and fifty thousand dollars. Contemporaneously with the signing of said agreement and deed the said H. H. Warner signed an instrument

in writing guaranteeing that the said Charles Cowland will carry out and perform the condition of said agreement above referred to. Afterwards, and on the same day, the agreement, deed, and instrument of guaranty were by the said Warner, John Lawler, and Ed. W. Wells deposited with the Bank of Arizona at Prescott, as the escrow holder thereof, in accordance with the terms, conditions, and provisions contained in said escrow agreement. While the escrow agreement and deed were executed in the name of Charles Cowland, the said Cowland was the agent of H. H. Warner, and Warner was the real party in interest in the transaction. The escrow agreement, deed, and guaranty were never recorded, but remained in the possession of the bank, as the escrow holder thereof, until November 10, 1893. About the fifteenth day of May, 1892, Lawler delivered to T. A. Rickard, as the agent of Cowland, the occupation of the said group of mines under the terms and conditions of the license contained in the escrow agreement, and the mines were operated until June 15th by and at the expense of the H. H. Warner Investment Company. On the fourteenth day of June the said H. H. Warner, Charles Cowland, W. M. Earl, W. R. Kennard, and Frank B. Bowen organized and incorporated under the laws of New Jersey the Industrial Mining and Guaranty Company, with a capital of five hundred thousand dollars, for the purpose of handling mines and industrial enterprises, buying and selling stock, etc.; and on the fifteenth day of June, 1892, said Charles Cowland transferred to the said Industrial Company his interest in the mining property involved in this suit for the purpose of handling, operating, and offering the same to the public, giving at that time to the said Industrial Mining and Guaranty Company a written assignment of all his right to said escrow agreement and a deed to his interest in and to the said agreement between him and the said Lawler and Wells, together with his right, title, and interest in the property described therein, reciting the deposit in escrow of the said agreement and the accompanying deed of date of May 12, 1892, and stating that the Industrial Company is to have the same right as Cowland under said deed and agreement, and is made the agent of Cowland to perform the conditions and provisions of the agreement, and upon such performance to receive the deed.

H. H. Warner, on said June 15th, made and delivered to the Industrial Mining and Guaranty Company his written consent to the making of said assignment and deed by Cowland. The Industrial Mining and Guaranty Company then, by resolution of the board of directors, assumed all the covenants, conditions, and agreements in the said escrow agreement of May 12, 1892, and promised to carry out and perform all the terms, conditions, and covenants contained therein on the part of Cowland, and to make the payment for said mines and mining property as provided for in the said escrow agreement. On the fifteenth day of June, 1892, T. A. Rickard delivered to the Industrial Mining and Guaranty Company the occupation of said group of mines, and the company thereupon entered into such occupancy, and remained therein until the first day of October, 1892. On the fifteenth day of August, 1892, said H. H. Warner, W. M. Earl, and one R. S. Hudspeth incorporated the Seven Stars Gold Mining Company, under the laws of New Jersey, with a capital of three million dollars, the object and purpose of said corporation being to hold, operate, and convey mines. The said H. H. Warner was the president of the Industrial Mining and Guaranty Company, and was also a director in and president of the Seven Stars Gold Mining Company. On September 10, 1892, the Industrial Mining and Guaranty Company, through its board of directors, offered to sell and convey all its right, title, and interest in the following mining properties, a portion of which are described in the escrow agreement and deed, to wit, the "Seven Stars," "Happy Jack," "Contact No. 1," "Contact No. 2" mines, and the claim known as "Camp," and the locations known as "Mescal," "Elwood," "Midnight," "Waterfall," and "Boulder," to a company formed, or to be formed, and known as the Seven Stars Gold Mining Company, upon said company showing that it had placed two hundred thousand dollars for working capital in its treasury and upon receiving two million eight hundred thousand dollars in cash or stock in the Seven Stars Gold Mining Company. On the first day of October, 1892, the Industrial Mining and Guaranty Company placed the Seven Stars Gold Mining Company in occupation of the Hillside group of mines, and said latter company thereupon entered into such occupancy under the terms, conditions, and provisions contained

in the escrow agreement of May 12, 1892, by the authority of
the resolution of the board of directors of the Industrial Min-
ing and Guaranty Company just quoted. The Industrial
Mining and Guaranty Company, as the agent of the Seven
Stars Gold Mining Company, under date of September 24,
1892, issued a prospectus, known as the "American Pros-
pectus," to promote the sale of the stock of the Seven Stars
Gold Mining Company, and circulated the same extensively
throughout the United States. The circulation began about
the twentieth day of September, 1892. On October 3, 1892,
the Industrial Mining and Guaranty Company, as agent for
the Seven Stars Gold Mining Company, authorized and di-
rected an English prospectus to be issued, but such prospectus
was not in fact ever issued or circulated in England or else-
where. A prospectus was issued and circulated in England
without the authority of the Industrial Mining and Guaranty
Company or the Seven Stars Gold Mining Company. Such
prospectus was prepared, supervised, and circulated by
Charles Cowland. The descriptive matter in the prospectus
was based upon data furnished by the officers of the Industrial
Mining and Guaranty Company. The circulation commenced
about October 5, 1892, and amounted to eighty thousand
copies. On the fifteenth day of May, 1892, at the Hillside
mines, Lawler and Wells delivered to T. A. Rickard a report
previously made upon said mines, known as the "Blauvelt
Report," together with a map of the underground workings
of said mines, as such workings then existed, known as the
"Blauvelt Map"; also copies of smelter and milling returns
of ore which had been previously shipped from said mines
and reduced, and known as "smelter returns." On Sep-
tember 28, 1892, at the request of H. H. Warner, Lawler sent
by express to Warner, in New York City, the original of said
smelting and milling returns. On August 27, 1892, Ed. W.
Wells visited the office of the Industrial Mining and Guar-
anty Company in New York City, and had an interview with
H. H. Warner, president of that company and of the Seven
Stars Gold Mining Company. On the thirtieth day of Au-
gust, and between that day and September 3, 1892, John
Lawler was in the office of the Industrial Mining and Guar-
anty Company in New York City, and learned that the Ameri-
can prospectus was being prepared for circulation for the

purpose of promoting the sale of the stock of the Seven Stars Gold Mining Company, and also became aware that the Blauvelt reports and map and copies of the smelter returns were being used as a basis of description of the Hillside group of mines to be contained in the proposed prospectus.

On October 28, 1892, H. H. Warner, in Prescott, represented to Lawler and Wells that he was unable to place securities that he held in time to meet the payment of that portion of the purchase price falling due November 12, 1892, and, relying upon said representations, on request of Warner, Lawler and Wells, on October 28, 1892, agreed to an extension of the time of payment under the agreement of May 12, 1892, and provided that the original agreement remain in full force except as to said modification touching the time of payment. On May 8, 1893, Warner made a general assignment of his property for the benefit of his creditors, and on May 11, 1893, Lawler and Wells, knowing of the assignment of Warner, executed an agreement with Charles Cowland stipulating that the payment mentioned in the original escrow agreement as falling due on May 12, 1893, may be made by said Cowland as follows: $9,098 in cash, and $4,500 to be paid on the first day of June, 1893, and the like sum to be paid on the first day of each of the following months,—viz., July, August, September, October, and November. A part of the consideration for the agreement for the extension of the time of payment was the issuance and delivery to Lawler and Wells of fifty thousand dollars, par value, of the guaranteed capital stock of the Seven Stars Gold Mining Company, and the appointment of John Lawler manager of operation of the Hillside group of mines; and John Lawler, on May 13, 1893, entered upon his duties as such manager. On the eighteenth day of August, 1893, the chancery court of New Jersey appointed John Griffin receiver of the Industrial Mining and Guaranty Company, and the said John Griffin qualified and entered upon his duties as receiver that day. The Seven Stars Gold Mining Company, from October 1, 1892, until August 17, 1893, continued to occupy and operate the Hillside group of mines under and by virtue of the occupation thereof so given to it by the Industrial Mining and Guaranty Company, under the terms, conditions, and provisions contained in the escrow agreement of May 12, 1892. On September 1, 1893,

neither Charles Cowland, nor the said receiver, nor the plaintiffs, nor any one of them, paid or offered to pay to Lawler and Wells the sum of four thousand five hundred dollars, payable on that day, according to the terms and conditions of the aforesaid escrow agreement and modifications thereof; nor has Cowland, nor has any one for him, paid said sum since said date; nor has Cowland, or any one for him, paid or caused to be paid any portion of any purchase money of said property falling due or payable on or after the first day of September, 1893, according to the terms and conditions of said escrow agreement of May 12, 1892. On the tenth day of September, 1893, Lawler and Wells, as owners of the legal title of the said Hillside group of mines, and claiming to exercise their rights under the escrow agreement of May 12, 1892, entered into possession of said Hillside group of mines, and from thenceforward until September 30, 1897, continued to remain in possession of said mines. On the tenth day of November, 1893, the Bank of Arizona, as escrow holder of the escrow agreement and deed dated May 12, 1892, at the request of Lawler and Wells, redelivered said deed, according to the terms of the escrow agreement, to the said Lawler and Wells. From the gross proceeds of operation by the Industrial Mining and Guaranty Company there was deposited in the Bank of Arizona, to the credit of Lawler and Wells, on account of the purchase price, in accordance with the escrow agreement of May 12, 1892, the sum of $19,987.61. During the operation of said property by the Seven Stars Gold Mining Company a like deposit was made for the same purpose, amounting to $47,812.25, aggregating the sum of $67,799.86. On May 12 and 24, 1892, H. H. Warner paid Lawler and Wells, on account of the purchase price of said property, the sum of fifty-one thousand dollars, and there was paid on and between November 12, 1892, and August 4, 1893, to Lawler and Wells, on account of the purchase price of said property, under the terms of the escrow agreement, various sums, aggregating the amount of $112,339.96.

During the life of the Industrial Mining and Guaranty Company it was engaged in promoting sundry mining, railroad, and industrial enterprises, including the business transactions of the Seven Stars Gold Mining Company. During that time it received and disbursed the sum of $824,142.13.

From June 15, 1892, to and including August 1, 1893, the moneys which it received and disbursed on account of its various enterprises were all deposited in its name in a common fund in the Continental National Bank of New York City, and checked against, used, and disbursed by it in its various enterprises as required therein, excepting the sum of $111,724.23, of which sum $67,799.86 were the gross proceeds of the ore from the Hillside group of mines, and the further sum of $43,924.37, which is composed of $224.37, money received prior to May 11, 1893, from the sale of the Seven Stars Gold Mining Company stock, and the remainder from loans obtained by said company subsequent to May 11, 1893.   Lawler and Wells did not at any time prior to the commencement of this action have any knowledge or notice that any money received by them on account of the purchase price of the Hillside group of mines, as provided for in the escrow agreement of May 12, 1892, came from the money or was any part of the money which any one or more of the purchasers of the stock of the Seven Stars Gold Mining Company had paid into the Industrial Mining and Guaranty Company on account of the purchase price of said stock.   Lawler and Wells were not the promoters of, nor in any wise interested in, the organization of the Industrial Mining and Guaranty Company, nor the Seven Stars Gold Mining Company, nor in the issuance or circulation of the prospectus, nor the issuance or sale of the capital stock of either of said companies, nor in the proceeds thereof.   After the eleventh day of May, 1893, the Industrial Mining and Guaranty Company received the sum of five hundred dollars, and no more, from the sale of the stock of the Seven Stars Gold Mining Company.   The amount received by the Industrial Mining and Guaranty Company from the sale of the guaranteed stock of the Seven Stars Gold Mining Company aggregated $253,128.05, of which sum $819.08 was returned to the subscribers, and the stock canceled, making the amount of money retained by the Industrial Mining and Guaranty Company from the sale of guaranteed stock $252,308.97.   There was received from the sale of common stock of the Seven Stars Gold Mining Company $2,583.89.   The Seven Stars Gold Mining Company did not keep any books of account of receipts and expenditures of money in the New York office, but all the receipts and ex-

penditures of money on account of the operation and expenditures of the Industrial Mining and Guaranty Company and the Seven Stars Gold Mining Company during their respective operation of the Hillside group of mines were kept by the Industrial Mining and Guaranty Company in its own books of account. The Industrial Mining and Guaranty Company, between the fifteenth day of June, 1892, and the eighteenth day of September, 1893, paid out for the operating expenses and purchase of machinery and purchase price of the Hillside group of mines, dividends, and other expenses, the aggregate sum of $380,259.81, which amounted to $127,986.84 more than the amount of money received by it from the sale of the Seven Stars stock, and $60,186.98 more than the aggregate amount of money received by it from the sale of stock and from the net proceeds of ore from the Hillside group of mines. During the operation of the said Hillside group of mines by the Seven Stars Gold Mining Company there was expended by the Industrial Mining and Guaranty Company for costs of operation, improvements, supplies, and machinery the sum of $112,411.32. On and between January 13, 1893, and May 10, 1893, the Industrial Mining and Guaranty Company paid out for dividends on stock sold of the Seven Stars Gold Mining Company the sum of $11,533.07 to holders of stock of the Seven Stars Gold Mining Company. The holders of stock of the Seven Stars Gold Mining Company did not, nor any of them, before the commencement of this suit, return or offer to return to the Seven Stars Gold Mining Company his stock, or any part thereof. Neither said stockholders, nor any of them, prior to the commencement of the action, returned or offered to return his or their portion of the dividends received by him or them from the Industrial Mining and Guaranty Company. There was never any meeting called or held of the stockholders of said Seven Stars Gold Mining Company, but on April 4, 1893, several stockholders, representing themselves and about three hundred others, voluntarily met at Jersey City, and there made demand upon John Griffin, receiver, to commence this suit, and he refused so to do. On and between the 20th of September, 1893, and September 30, 1897, Lawler and Wells received from the operations of the Hillside group of mines the sum of $37,376.86, and disbursed in such operations during that

time the sum of $35,658.93. Between November 17, 1893,
and the commencement of this action the plaintiffs, or said
receiver, or any one of them, or either of them did not make
any demand upon Lawler and Wells for the possession of the
properties in controversy, or any part thereof. In 1895, C. B.
Wiser and twenty others, stockholders in the Seven Stars
Gold Mining Company, brought suit against Lawler and
Wells and others in the district court of Yavapai County,
setting up the facts, and alleging that the representations of
ownership as set forth in the prospectus issued September,
1892, were false and fraudulent, and that plaintiffs were mis-
led thereby; that Lawler and Wells assisted in the prepara-
tion and circulation of the said prospectus; and prayed that
the court decree Lawler and Wells to have, by their conduct,
estopped themselves, as against the plaintiffs and others in
like estate, from asserting that the Seven Stars Gold Mining
Company is not the owner of the mines and mining property
described in the prospectus and pictured on the map, re-
questing a provision in the said decree for an accounting,
and a money judgment against Lawler and Wells upon such
accounting for all the proceeds and value of ore, bullion, and
other property taken from the mines and mining property
and received by the said Lawler and Wells between the
twelfth day of May, 1892, and the date of entry of final
decree, together with a money judgment against Lawler and
Wells for all damages caused by them to said mines and
mining property; or that the court decree that the said plain-
tiffs and all others in like estate may have and recover from
the said Lawler and Wells the aggregate amount of money
paid by plaintiffs and others in like estate for stock in the
Seven Stars Gold Mining Company; and for other relief.
On May 13, 1896, after taking part of the evidence, the plain-
tiffs amended the bill to conform to the proofs. To this
amended complaint Lawler and Wells filed general and special
demurrers and a plea of estoppel in the nature of an answer.
Receiver Griffin filed a short answer. The Seven Stars Gold
Mining Company and the Industrial Mining and Guaranty
Company were adjudged in default for want of answer. On
September 22, 1897, the cause came on for hearing before
Hon. H. C. Truesdale, presiding judge. Depositions were
read, witnesses examined, documents offered in evidence, and

the cause exhaustively argued. Thereupon the court entered
an interlocutory decree in favor of plaintiffs, calling for an
accounting before a master in chancery, and appointing a
receiver for the property. Pending an accounting before the
special master, Judge Truesdale died. The case was then
assigned to Hon. Webster Street. The report of the special
master was returned July 8, 1898. On July 12, 1898, the
cause was further heard before his Honor Webster Street on
the report of the special master in chancery and the report of
the receiver. The report was by the court examined and
approved. The resignation of the receiver was accepted, and
the sureties on his bond discharged from liability, and Law-
ler and Wells, with consent of plaintiffs, were appointed
receivers without compensation, and judgment and final de-
cree were entered in favor of plaintiffs in accordance with
the findings and conclusions of Judge Truesdale, and Lawler
and Wells filed a motion for a new trial. After full argu-
ment thereon, on October 22, 1898, the motion for a new trial
was granted. On November 1, 1898, by consent, the prayer
of the complaint having in the·mean time been amended, the
case was submitted for decision to Judge Street upon the plead-
ings and the evidence then in the record, and upon the argu-
ments made on the motion for a new trial, whereupon the
court held that plaintiffs were entitled to no relief, and
ordered the dismissal of the complaint. The dismissal carried
the cross-bill with it. Findings of fact and conclusions of
law were made and filed in the case by the court, and a decree
in accordance therewith entered, and the motion for a new
trial was denied. From the judgment of the court dismissing
the amended complaint and overruling the motion for a new
trial the plaintiffs appeal, and have presented twenty assign-
ments of error.

Some of the assignments are too general and indefinite to
receive any consideration by this court. The first assignment
alleges that ''the district court erred in decreeing that plain-
tiffs are entitled to no relief in the case.'' The fifth assign-
ment alleges ''the court erred in refusing and rejecting the
findings of fact, and each of them, submitted by plaintiffs,''
referring to nineteen different findings submitted by plain-
tiffs, only eight of which are presented in the abstract of
record furnished this court. The fifteenth assignment of

error alleged that "the findings of the court are incomplete and erroneous," with no statement or specification wherein the errors or incompleteness consist. The findings of the trial court, as presented by the record, embrace sixty-one different and distinct findings of fact. In a case very similar to this one (*The City of New York,* 147 U. S. 76, 13 Sup. Ct. 213, 37 L. Ed. 87), in which sixteen exceptions were taken to the findings of the court, twenty-one specifications of error were embodied in the seventeenth exception to the opinion of the court, and there were thirty-five exceptions to the refusal of the court to find the facts and law as requested by the claimants, Mr. Justice Brown of the United States supreme court said that it was not the duty of the court to review the testimony upon every finding of fact to which the defeated party takes an exception, and inquire whether such testimony authorized the finding. In that case the court held: First. "That the facts found by the court below are conclusive, that the bill of exceptions cannot be used to bring up the evidence for a review of these findings, that the only rulings upon which we are authorized to pass are such as might be presented by a bill of exceptions prepared as in actions at law, and that the findings have practically the same effect as the special verdict of a jury." *The Clara,* 102 U. S. 200, 26 L. Ed. 145; *The Abbotsford,* 98 U. S. 440, 25 L. Ed. 168; *The Benefactor,* 102 U. S. 214, 26 L. Ed. 157; *The Annie Lindsley,* 104 U. S. 185, 26 L. Ed. 716; *Collins* v. *Riley,* 104 U. S. 322, 26 L. Ed. 752; *Watts* v. *Camors,* 115 U. S. 353, 6 Sup. Ct. 91, 29 L. Ed. 406; *The Gazelle,* 128 U. S. 474, 9 Sup. Ct. 139, 32 L. Ed. 496. Second. "That it is only the ultimate facts which the court is bound to find, and that this court will not take notice of a refusal to find the mere incidental facts which only amount to evidence from which the ultimate fact is to be obtained." *The Francis Wright,* 105 U. S. 381, 26 L. Ed. 1100; *The John H. Pearson,* 121 U. S. 469, 7 Sup. Ct. 1008, 30 L. Ed. 979; *Insurance Co.* v. *Allen,* 121 U. S. 67, 7 Sup. Ct. 821, 30 L. Ed. 858. Third. "If the court below neglects or refuses to make a finding, one way or the other, as to the existence of a material fact, which has been established by uncontradicted evidence, or if it finds such a fact when not supported by any evidence whatever, and an exception be taken, the question may be brought up for re-

view in that particular. In the one case the refusal to find would be equivalent to finding that the fact was immaterial, and in the other that there was some evidence to prove what is found, when in truth there was none. Both of these are questions of law, and proper subjects for review in the appellate court." *The Francis Wright,* 105 U. S. 387, 26 L. Ed. 1100; *The E. A. Packer,* 140 U. S. 360, 11 Sup. Ct. 794, 35 L. Ed. 453. "This case must then turn upon the question whether the circuit court found any facts which were wholly unsupported by testimony, or refused to find any fact material to the issue, when such fact was proven by uncontradicted evidence." This court will, in accordance with the rule laid down above, take up the assignments which are sufficiently distinct and specific to direct the attention of the court to the errors complained of, and will look into and review the determination by the lower court of those issues which are decisive of the interests and rights of the parties, and controlling in the disposition of the case.

The second assignment of error alleges that "the court erred in not decreeing relief to the plaintiffs pursuant to the first prayer of the amended complaint." The complainants pray, first, that the court decree that the defendants Lawler and Wells have by their conduct estopped themselves, and they are now estopped, as against the plaintiffs and others in like estate, from asserting that the Seven Stars Gold Mining Company is not the owner of the property described in the prospectus and pictured on the map, and that the court order, adjudge, and decree that the full title to the said mines and mining properties, and every part thereof, is in the Seven Stars Gold Mining Company; with prayer for perpetual injunction, money judgment upon an accounting for proceeds of ore and bullion taken from the mine between the 12th of May, 1892, and the date of entry of final decree, and money judgment for damages, said money judgment to run to the Seven Stars Gold Mining Company, in the interest and for the benefit of *bona fide* stockholders, plaintiffs, and others in like estate. This assignment raises and presents squarely the question whether the facts pleaded and sustained by the proof constitute an equitable estoppel against the defendants Lawler and Wells. The supreme court of Utah has said, in *Bingham Young Trust Co.* v. *Wagner,* 12 Utah, 1, 40 Pac. 764: "Mat-

ters pleaded by way of equitable estoppel must be of such a character, and sufficient, as pleaded, to make a cause of action for deceit on the part of the plaintiffs. The rule is stated in language of infinite variety in the many cases that have arisen in the courts. In *Branson* v. *Wirth*, 17 Wall. 32, 21 L. Ed. 566, the supreme court of the United States say: 'If one person is induced to do an act prejudicial to himself in consequence of the acts or declaration of another on which he had a right to rely, equity will enjoin the latter from asserting his legal rights against the tenor of such acts or declarations.' In *Dickerson* v. *Colgrove*, 100 U. S. 578, 25 L. Ed. 618, upon the same subject, the supreme court say: 'He who, by his language, leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted.' It is not necessary to quote from other authorities. The rule is easily deducible from these. It is this: In order to create an estoppel of this character, it is necessary that the plaintiff, either by language or conduct, should have— first, falsely represented or concealed a material fact; second, the false representation or concealment must have been knowingly made; third, the party pleading the estoppel must have been ignorant of the facts; fourth, the representation must have been made with the intention that it should be acted upon; fifth, the party pleading it must have been mis- led thereby to his injury in some substantial particular.'' Tested by this rule, are the facts that have been established in this case sufficient to create an equitable estoppel against Lawler and Wells as to the plaintiffs in the case? There are no allegations of fraud, misrepresentation, or concealment by Lawler and Wells in their dealings with Warner and Cowland in the contract for the disposal of the mines to those persons. The claim is based upon misrepresentation alleged to have been made by Lawler and Wells, in conjunction with Warner and the officers of the Industrial company in the prepara- tion and circulation of the American prospectus and accom- panying map distributed to the stockholders of the Seven Stars Gold Mining Company, asserting the ownership in the mines to be in the Seven Stars Company; and the like action on the part of Lawler and Wells, with the same parties, in the preparation and distribution of the English prospectus containing the same assertion.

We will first consider the English prospectus. The complaint alleges that about September 27, 1892, there was issued another printed prospectus for the purpose of distribution in England and Scotland; that this said prospectus was prepared by said Warner and the officers of the said gold company, with the assistance, knowledge, consent, sanction, and acquiescence of the said Lawler and Wells, in and by which prospectus it is stated that "the mines owned by the company are situated in the Eureka Mining District, Arizona"; that the said prospectus was generally circulated in London and other cities of England, and also in cities and towns of Scotland. The district court found as a fact that on October 3, 1892, the Industrial Mining and Guaranty Company, as the authorized agent of the Seven Stars Gold Mining Company, did authorize and direct an English prospectus to be issued; that such prospectus was never circulated in England or elsewhere; that a prospectus was issued and circulated in England without the authority of the directors of the Industrial Mining and Guaranty Company or the Seven Stars Gold Mining Company; that neither John Lawler nor Ed. W. Wells had any knowledge or information that this latter prospectus had been or was circulated in England, or had any knowledge or notice of its contents, prior to October, 1893. The only ground for estoppel against Lawler and Wells as connected with the English prospectus which the pleadings present is the allegation of the ownership of the mines in the Seven Stars Gold Mining Company. Not only did Lawler and Wells deny the making of such assertion themselves, or the knowledge on their part of any such assertion having been made in such prosepctus, or the knowledge of the circulation of any prospectus containing such assertions, but the evidence presented by the plaintiffs themselves to sustain the above allegation of the complaint was the record book of the Industrial Mining and Guaranty Company, which shows a meeting of October 3, 1892, at which the London prospectus was approved. This prospectus, as fastened in the minute-book of the company, is the same as the prospectus attached to the complaint of the plaintiffs, with the exception of the third paragraph of the body of such prospectus, which reads that "the mines are situated in the Eureka Mining District, Yavapai County, Arizona," instead of "the mines owned by

the company are situated in the Eureka Mining District,
Yavapai County, Arizona.'' This eliminates the English
prospectus, and any claim made under it by the plaintiffs,
from any further consideration in the case; the only evidence
introduced tending to charge Lawler and Wells with any
responsibility arising from the English prospectus being evidence (contradicted by Lawler and Wells) tending to charge
Lawler with participation in the preparation and knowledge
of the contents of the English prospectus being prepared by
the officers of the Industrial company between August 31,
1892, and September 3, 1892. As their own evidence establishes the fact that the prospectus then in course of preparation, and afterwards approved by them, did not contain the
damaging assertion complained of, it is immaterial whether
or not Lawler assisted in the preparation of such prospectus,
or had knowledge of its contents; and as they have offered
absolutely no evidence that either Lawler or Wells had any
knowledge of either the circulation or contents of any other
prospectus than this, there could, under no possible view of
the case, any liability attach therefrom.

We will next proceed to the consideration of the grounds
of estoppel that have been shown in connection with the
American prospectus and the accompanying map. It is alleged in the complaint that ''On or about the 24th day of
September, 1892, the said Lawler, as agent of the said Wells,
and acting for both of said defendants, well knowing the
condition of the title of the said mines, on his own behalf
and on behalf of said Wells assisted and aided the said H. H.
Warner to prepare, and cause to be issued, a prospectus reciting, among other things, on the second page of said prospectus, 'This company is formed to acquire, without further
expense or liability to subscribers, on October 1st, 1892, as a
''going concern,'' and to provide a working capital to further
equip and develop the ''Seven Stars'' and ''Happy Jack''
mines, also the locations ''Mesa,'' ''Elwood,'' ''Midnight,''
''Waterfall,'' and ''Boulder'' '; that accompanying and a
part of said prospectus there was prepared a map or plat of
said mining properties by the said Lawler and Wells and the
said Warner, upon which map the following representation
and statement appears, 'Map of the group of mines belonging
to the Seven Stars Gold Mining Co., Yavapai County, Ari-

zona'; that said prospectus, map, and blank applications were distributed throughout the United States by said H. H. Warner and the secretary and treasurer of said company; that copies of said prospectus, map, and blank applications came to plaintiffs herein during the month of October, 1892, and the said plaintiffs, relying upon and believing and being led and induced by representations made and contained in said prospectus and map, severally subscribed for stock in the Seven Stars Gold Mining Co.'' The only fraud herein charged upon Lawler and Wells in connection with the American prospectus is the recital and representation of the title to said mines and mining property in the said gold company contained in said prospectus, and the omission of any recital tending to show title to the said property in any other person or persons than said company; and the only statement or assertion of the title complained of to the court is the recital on the second page, just quoted: ''This company is formed to acquire, on October 1st, 1892, as a 'going concern,' and to provide a working capital, and to further equip and develop, the Seven Stars mines''; and that accompanying said prospectus, as part thereof, was a map, upon which the statement appears, ''Map of the group of mines belonging to the Seven Stars Gold Mining Co.'' The district court held as a conclusion of law ''that the purchasers of the capital stock of the Seven Stars Gold Mining Company were not authorized, from reading the prospectus, maps, and blank applications distributed, to so construe the same as to believe or conclude therefrom that the legal title of the properties mentioned therein was vested in the Seven Stars Gold Mining Company.'' Without determining at this time whether or not the conclusion is authorized in its entirety, it is sufficient for the consideration of the question now presented that the statement in the prospectus, taken by itself, instead of asserting title in the Gold company, is equivalent to the contrary assertion. The object being stated, on September 24th, to acquire on October 1st the mines mentioned, would justify the belief that the title was not then in the company, but would be acquired in the future. Whether the statement placed on the map was calculated to modify this belief would not be material as to Lawler and Wells, because the district court found as a fact (finding No. 19) ''that the defendant Lawler, on his

visit to New York, August 30, 1892, saw the original Brodie
map hanging on the wall of the office of said companies in
New York; that the original Brodie map, of which defend-
ants' map Exhibit A is a true copy, had indorsed thereon
the words, to wit, 'Plat of the Hillside and adjoining claims,'
and said words were written on the original draft of dis-
tributed map Exhibit C, attached to the complaint; that said
quoted words were, before distribution, changed to the words,
'Map of the group of mines belonging to the Seven Stars
Gold Mining Co.'" This finding is supported by the evi-
dence of A. O. Brodie, the maker of the map, who identified
the map in evidence on the trial as a true trace of the map
made by him for the Hillside Company, and testified: "This
map purports to be a map of the different mines and mining
locations, and bears the inscription, 'The Hillside Mines,
Yavapai County, Arizona. Prescott, Arizona, August 1,
1892.' These are the letters I put on the original map.
I understood then that the mines were being operated
by the Hillside Mining Company." Another map was
handed to the witness, who said: "That is a trace
of the map I made for the Hillside company. I made
the original of these two maps. B purports to be
a map of the mines and claims involved in this litigation,
and bears the inscription, 'The Hillside Mines, Yavapai
County, Arizona. Prescott, Arizona, August 1, 1892. Sur-
veyed and drawn by Alexander O. Brodie, Civil Engineer.'
I forwarded the original map to H. H. Warner some time
during the month of August, 1892. I never drew a map with
the words 'Belonging to the Seven Stars Gold Mining Co.'
on it, or any words that indicated that the locations belonged
to the Seven Stars Gold Mining Company." Abst. Ev., p.
212. Lawler testified: "Warner and Kennard asked me
about the mines. I told them I was not to the mine since I
sold it to them. Right along the wall a map hung, and there
was some very rich ore. They asked me what I thought of the
map. The map was up over the ore. I looked at the map.
I do not remember what was written on the map. It was up
so far I could not read it. The only thing I noticed was the
outlines above that looked like workings I made myself. I
told them it looked natural.—Q. What, if any, conversation
had you about stocking this mine, and selling the stock, and a

prospectus?—A. None whatever.—Q. What, if any, prospectus was shown you?—A. None whatever. I was never in Warner's private office. I never received any prospectus. I first saw one in October, 1893, in Denver, on my way back from the World's Fair. I was in California during the time those were booming around here, the whole year.—Q. When you were in New York, what was shown you to read,—what reading matter in the nature of prospectuses or circulars about those mines?—A. Nothing at all was shown me. I never saw the prospectus of the Seven Stars Gold Mining Co." Abst. Ev., p. 223. The complaint alleges that the prospectus and map were chiefly prepared and mailed by H. H. Warner and the secretary and treasurer of the company, assisted by said Lawler and Wells. Footner, the secretary and treasurer, testified: "The prospectus, map, and blank applications were prepared and printed within three weeks prior to the date printed on them. H. H. Warner supervised the preparation thereof, was the principal in the matter, and the greater part of the documents were framed in accordance with his views. Concerning what information John Lawler had in connection with the preparation of the prospectus, I can only say that in conversation I made him aware of that fact, and that he knew the prospectus was being prepared prior to my interview with him. I never met Ed. W. Wells. Concerning Wells's knowledge of the transaction I am entirely ignorant, excepting that the Industrial Company mailed to Lawler and Wells a number of the prospectuses." H. H. Warner stated in evidence: "My supposition is that Lawler and Wells knew that the prospectuses, copies of which were to be sent out in the quantites that were talked about with Lawler, would be printed, not written. I have no knowledge whether Lawler knew that they were printed or written." The utmost extent to which the evidence in the case goes is to show that Lawler and Wells had knowledge of the preparation and circulation of the prospectus and map. There is no evidence that they knew the statements or representations contained in the prospectus or on the map, or that they occupied such a relation to the preparation or circulation thereof as would impose upon them a duty to know the contents. The bare knowledge, therefore, of such preparation and circulation, will impose no duty nor fasten any liability upon

Lawler and Wells arising from any statement, fraudulent or otherwise, contained in such prospectus or map, without evidence of knowledge on their part of such statements being contained therein. It does not appear from the evidence in the case that the defendants, or either of them, were the authors of any false or fraudulent statements, either in the prospectus or on the map, calculated to mislead or deceive innocent purchasers; or that they, or either of them, had knowledge of any such statements and the falsity thereof, and stood by in silence while innocent purchasers were misled thereby. There is, therefore, no case for the application of the doctrine of equitable estoppel. "For its application there must be some intended deception in the conduct or declarations of the party to be estopped, or such gross negligence as to amount to constructive fraud." *Henshaw* v. *Bissell,* 85 U. S. 271, 21 L. Ed. 841.

The disposition of the questions above determined will render unnecessary a consideration of the third and fourth assignments, as they refer simply to the alternate prayer for relief in the complaint, based upon the same allegations of fraud and misrepresentation upon which the error alleged in the first assignment was predicated.

It is next assigned severally, in the succeeding eight assignments of error, that the court erred in rejecting the third, seventh, ninth, tenth, eleventh, fourteenth, fifteenth, and nineteenth findings of fact submitted by the plaintiffs. An examination of these several findings discloses that the third finding, as requested, was not sustained by the evidence in the case, and therefore was properly rejected. The seventh finding related only to evidentiary facts, the refusal to find which by the trial court will not be reviewed by this court. The ninth to nineteenth findings, inclusive, request the finding of a number of evidentiary facts, some of which were elsewhere found by the court, some of which were adversely found on conflicting evidence, some of which were not proven by any evidence appearing in the record, and many of which were not material, but were simply incidental facts which would only amount to evidence from the which the ultimate fact might be deduced. A careful examination of the facts requested to be found in the several findings enumerated and of the evidence as shown by the record has failed to disclose

a refusal by the lower court to find an ultimate or material fact which was supported by uncontradicted evidence, nor has there been in any instance a fact other than, or contradictory to, the facts therein requested, found by the court unsupported by evidence. We do not, therefore, feel authorized to disturb the findings of the lower court in the instances that are herein presented. We think the language of the United States circuit court of appeals (*Snider* v. *Dobson,* 21 C. C. A. 76, 74 Fed. 757) is applicable to the case now under consideration. The court there says: "In the circuit court the decision turned solely upon an issue of fact. The circuit court decided the issue. We have carefully read and considered all the testimony contained in the record, and have reached the conclusion that there were facts and circumstances developed on the hearing of the case which were fully adequate to warrant the inference that the circuit court appears to have drawn. The issue being one of fact, it would subserve no useful purpose to narrate the evidence in detail. It will suffice to say that the testimony was of such nature that different unprejudiced minds might with equal reason draw different inferences and reach different conclusions. This court, however, has repeatedly declared that where a master or chancellor has considered conflicting evidence, and made a finding thereon, the finding will be taken as presumptively correct, and will be permitted to stand, unless an obvious error has intervened in the application of the law, and some serious and important mistake appears to have been made in the consideration of the evidence. *Warren* v. *Burt,* 7 C. C. A. 105, 58 Fed. 101; *Paxson* v. *Brown,* 15 C. C. A. 228, 61 Fed. 874; *Stuart* v. *Hayden,* 18 C. C. A. 618, 72 Fed. 402; *McKinley* v. *Williams,* 20 C. C. A. 312, 74 Fed. 94. The same rule has been announced and acted upon by the supreme court of the United States on several occasions. *Tilghman* v. *Proctor,* 125 U. S. 136, 8 Sup. Ct. 894, 31 L. Ed. 664; *Kimberly* v. *Arms,* 129 U. S. 512, 9 Sup. Ct. 355, 32 L. Ed. 764; *Evans* v. *Bank,* 141 U. S. 107, 11 Sup. Ct. 885, 35 L. Ed. 654; *Furrer v. Ferris,* 145 U. S. 132, 12 Sup. Ct. 821, 36 L. Ed. 649. We have concluded, therefore, that, inasmuch as the case turned upon an issue of fact, and inasmuch as the evidence was fully adequate to justify the finding made by the trial judge, it should be allowed to stand."

It is argued in the brief of the appellants that the defendants

are estopped to disturb the appearance and representation of ownership of the property by the Seven Stars Gold Mining Company, as evidenced by their occupation and use of such property; but the evidence in the case shows that the Seven Stars Gold Mining Company did not at any time claim or exercise, or attempt to hold or exercise, any possession adverse to Lawler and Wells, or inconsistent with the use, possession, and occupation granted to Cowland by the license contained in the escrow agreement, and to which they would succeed as Cowland's assigns or agents; hence Lawler and Wells had not placed upon them the duty, nor were they given any occasion or necessity, to assert or make known their claim to the title. The evidence discloses that Lawler and Wells did not know, during the time of the occupation and possession of the property by the Seven Stars Gold Mining Company, that the plaintiffs, as purchasers of the stock, were ignorant of the provisions and terms of the escrow agreement, or that they, as such purchasers, had been informed or believed that the Seven Stars company owned the title of the mines, instead of holding and working them under the license of the escrow agreement.

It was also argued that the receipt by Lawler and Wells of the returns from the ore should likewise operate as such estoppel, but the evidence likewise disclosed that such disposition of the receipts from the ore was in accordance with the provisions of the escrow agreement, of which the Industrial Mining and Guaranty Company and the Seven Stars Gold Mining Company were fully cognizant; and Lawler and Wells would not be responsible for any fraud practiced on the stockholders of such company by the officers and the directors, of which they were as ignorant as the stockholders; and as the only dealing of the officers and directors with such stockholders of which Lawler and Wells had any knowledge was consistent with honesty and fairness, and apparently in harmony with the provisions of the escrow agreement under which they were working, and of whose provisions Lawler and Wells supposed the stockholders to be as fully advised as the officers and directors, there would be nothing to put Lawler and Wells upon inquiry. The facts pertinent to these issues have been found by the trial court, and such findings have been based upon evidence contained in the record.

After a patient and careful examination of the record, we are convinced that the lower court correctly held "that the facts proven are not sufficient to constitute a cause of action against John Lawler and Ed. W. Wells, or either of them, or against the property in controversy, or any part thereof." The judgment and decree of the lower court are therefore affirmed.

Street, C. J., and Davis, J., concur.

Sloan, J., having been connected with the case as counsel, took no part in its consideration in this court.